**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE**

_____

)
AMTRUST FINANCIAL SERVICES, INC.,    )
)
        Plaintiff,    )
)
v.    )    C.A. No. _____
)
LIBERTY INSURANCE UNDERWRITERS    )    **JURY TRIAL DEMANDED**
INC.,    )
)
        Defendants.    )
_____)

## COMPLAINT

Plaintiff AmTrust Financial Services, Inc. ("AmTrust"), by and through its attorneys, brings this Complaint against Defendant, Liberty Insurance Underwriters Inc. ("Liberty") and alleges as follows:

## NATURE OF THE ACTION

1.    This is an action for declaratory judgment and breach of an excess directors' and officers' ("D&O") liability insurance policy (No. DONYABDB3T001) (the "Liberty Excess Policy") sold by Liberty to AmTrust for losses resulting from securities claims and government investigations.

2.    AmTrust paid substantial premiums to Liberty to protect against the potential risk of losses from lawsuits involving its securities. Thus, the D&O policy that Liberty sold to AmTrust protects against these risks with specific coverage for both "Securities Claim[s]" and "Pre-Claim Inquir[ies]."

3.    AmTrust seeks just that: the reimbursement of costs incurred to defend against a consolidated securities litigation styled *In re AmTrust Financial Services, Inc. Securities*

*Litigation,* Case No. 17-cv-01545-LAK, previously pending in the United States District Court for the Southern District of New York (the "2017 Securities Litigation"), a consolidated derivative litigation styled *In re AmTrust Financial Services, Inc. Derivative Litigation*, Case No. 17-cv-00553-MN, previously pending in the United States District Court for the District of Delaware (the "2017 Derivative Litigation"), and the interview requests related to subpoenas served on AmTrust in 2017 by the United States Securities and Exchange Commission ("Commission") (the "2017 Commission Subpoenas," collectively with the 2017 Derivative Litigation and 2017 Securities Litigation, the "2017 Securities Matters").

4.      AmTrust's first two insurers – the primary, Illinois National Insurance Company, a subsidiary of AIG ("AIG"), and the first-layer excess, Atlantic Specialty Insurance Company, a subsidiary of OneBeacon ("OneBeacon") – concluded that each of the 2017 Securities Matters is covered under their respective policies, and accordingly, have paid their full limits totaling $20 million as reimbursement for fees and expenses incurred to defend against these matters.

5.      Liberty, the second excess insurer, refuses to reimburse AmTrust for costs incurred in defending the 2017 Securities Matters, even though AmTrust has incurred, is incurring, and may yet continue to incur, significant expenses to defend against the 2017 Securities Matters.  As of March 1, 2021, AmTrust's total defense expenses exceeded $39 million, and AmTrust continues to incur defense expenses for the pending 2017 Securities Litigation.  Liberty's excess policy provides $10 million in coverage excess $20 million in underlying limits.

6.      Liberty was happy to accept AmTrust's premiums, but to date, Liberty has refused to pay any amount in coverage.  Liberty has flatly denied coverage for the 2017 Securities Matters with a hodge-podge of meritless coverage positions.

7.      First, Liberty contends that AIG and OneBeacon, AmTrust's underlying insurers,

made improper reimbursement payments to AmTrust for expenses related to the 2017 Commission Subpoenas.  Liberty argues, given their alleged impropriety, those payments did not exhaust the underlying limits.

8.      Liberty has also raised relation-back and notice defenses.  AmTrust disputes all these arguments.  AmTrust has, therefore, been forced to commence this action to enforce its rights under the Liberty Excess Policy to collect proceeds of the policy that ought to have been paid by Liberty more than two years ago.

9.      Accordingly, this Complaint seeks declaratory relief, pursuant to 28 U.S.C. § 2201 and Rule 57 of the Federal Rules of Civil Procedure and seeks damages for breach of contract resulting from Liberty's failure to fulfill its obligations to AmTrust under the D&O policy it sold to AmTrust in connection with the 2017 Securities Matters.

## PARTIES

10.     Plaintiff AmTrust Financial Services, Inc. is a Delaware corporation with its principal place of business in New York.

11.     On information and belief, Defendant Liberty Insurance Underwriters Inc. is an insurance company incorporated under Illinois law with its principal place of business in Massachusetts, which regularly conducts business in the State of Delaware.

## JURISDICTION AND VENUE

12.     This Court has diversity jurisdiction under 28 U.S.C. § 1332(a)(1) and § 2201 because there is complete diversity between AmTrust, a Delaware corporation headquartered in New York, and Liberty, a citizen of Illinois and Massachusetts, and because the amount in controversy exceeds $75,000.

13.     This court has personal jurisdiction over Liberty because Liberty issued the relevant

insurance policy to provide coverage for AmTrust, a Delaware corporation, and its officers, directors, and subsidiaries, under terms to be performed by Liberty within the State of Delaware.

14.     Venue is proper under 28 U.S.C. § 1391(b)(2) because Liberty is authorized to sell or write insurance in Delaware and, at all relevant times, conducted business within the State of Delaware, providing coverage for AmTrust, a Delaware corporation, and its officers, directors, and subsidiaries.

## FACTUAL BACKGROUND

15.     AmTrust is a multinational property and casualty insurer and an industry leader in small business insurance.

### I.     The 2017 Securities Litigation

16.     In or around March of 2017, AmTrust and several of its directors and officers were named as defendants in various securities actions related to a financial restatement.  Those litigations were consolidated into a single securities class action entitled *In re AmTrust Financial Services, Inc. Securities Litigation*, Case No. 17-cv-01545-LAK, in the United States District Court for the Southern District of New York. Attached hereto as Exhibit A is a true and correct copy of the 2017 Securities Litigation's Third Consolidated Amended Complaint.

17.     The 2017 Securities Litigation asserts a claim against AmTrust for alleged violations of Section 10(b) and Rule 10b-5 of the Securities Exchange Act (the "Act"), and a claim against the named "Officer" defendants for alleged violations of Section 20(a) of the Act.  Both sets of violations purportedly arise out of AmTrust's restatement of line items in its financial statements and acknowledgement of material weaknesses in its internal controls.

18.     On September 9, 2019, the United States District Court for the Southern District of New York (Judge Lewis A. Kaplan) granted AmTrust's motion to dismiss the 2017 Securities

Litigation with leave to amend.  The Court found that the plaintiffs' allegations were primarily based on statements of opinion, or immaterial misstatements.

19.     On April 20, 2020, after the plaintiffs filed a third amended complaint, Judge Kaplan dismissed the action with prejudice, finding that the plaintiffs had once again failed to plead sufficient material misstatements.

20.     On May 22, 2020, the 2017 Securities Litigation plaintiffs filed a notice of appeal, for which AmTrust continues to incur defense expenses.  Attached hereto as Exhibit B is a true and correct copy of the Notice of Appeal.

## II.     The 2017 Derivative Litigation

21.     Beginning in or around March of 2017, several of AmTrust's directors and officers were named as defendants in derivative litigation, with AmTrust as a nominal defendant.  This derivative litigation was consolidated into an action styled *In re AmTrust Financial Services, Inc. Derivative Litigation*, Case No. 17-cv-00553-MN, previously pending in the United States District Court for the District of Delaware.  Attached hereto as Exhibit C is a true and correct copy of the Verified Second Amended Stockholder Derivative Complaint.

22.     Like the 2017 Securities Litigation, the 2017 Derivative Litigation purportedly arose out of AmTrust's restatement of line items in its financial statements and acknowledgement of material weaknesses in its internal controls.

23.     The 2017 Derivative Litigation alleges the following claims: (i) breach of fiduciary duty against certain purported directors of AmTrust; (ii) breach of fiduciary duty against certain purported officers of AmTrust; (iii) unjust enrichment against all defendants; (iv) breach of fiduciary duty for insider selling and misappropriation of confidential information against purported directors accused of insider selling; (v) violations of Section 10(b) and Rule 10b-5 of

5

the Exchange Act against all defendants; (vi) violations of Section 20a of the Exchange Act against the defendants accused of insider selling; (vii) violations of Section 29(b) of the Exchange Act against officer defendants; and (viii) corporate waste against all the defendants.

24.     The plaintiffs in the 2017 Derivative Litigation voluntarily dismissed the action on February 14, 2019.

### III.     The 2017 Commission Subpoenas

25.     In April 2017, around the same time that the 2017 Securities Litigation and the 2017 Derivative Litigation began, the Commission served subpoenas on AmTrust (the "2017 Commission Subpoenas").

26.     The 2017 Commission Subpoenas were broad in scope, seeking documents concerning the following: (i) warranty premiums and losses; (ii) earning patterns for premiums in the warranty business; and (iii) setting of loss ratios.

27.     After the issuance of the subpoenas, the Commission requested interviews and went on to take the testimony of numerous AmTrust employees, officers, and senior executives, including testimony from former Chief Financial Officer Ronald Pipoly, and Deputy Chief Financial Officer Zachary Wolf.

28.     The Commission investigation concluded after a final round of interviews and a settlement with AmTrust, which was approved by the United States District Court for the Southern District of New York on June 19, 2020.  AmTrust entered into a Consent Decree with the Commission on December 19, 2019, and Ron Pipoly entered into a separate Consent Decree with the Commission on December 19, 2019.

29.     Additionally, Gibson, Dunn & Crutcher LLP's ("Gibson Dunn") collection of documents and coordination on the preparation of witnesses in connection with the 2017

Commission Subpoenas, with respect to which certain Defense Costs were incurred, benefitted the 2017 Securities Litigation, and formed a part of the defense (and may form part of the defense in the future) of the 2017 Securities Litigation.

## IV.     AmTrust's D&O Policies

30.     AIG issued primary D&O liability policy no. 01-863-24-81 for the policy period of September 30, 2016 to September 30, 2017 (the "Policy Period"), with an aggregate limit of $10 million (the "AIG Primary Policy").  A true and correct copy of the AIG Primary Policy is attached hereto as Exhibit D.

31.     The AIG Primary Policy applies a $1,000,000 self-insured retention.

32.     The AIG Primary Policy is followed by the first-layer excess D&O liability policy no. FIN000101/0000 issued by OneBeacon for the Policy Period, which follows form to the AIG Primary Policy, and provides $10 million excess of $10 million in underlying limits ("OneBeacon Excess Policy").

33.     The Liberty Excess Policy is the second-layer excess policy providing $10 million excess of $20 million in underlying limits.  A true and correct copy of the Liberty Excess Policy is attached hereto as Exhibit E.  The AIG Primary Policy, the OneBeacon Excess Policy and the Liberty Excess Policy are collectively referred to herein as the "D&O Policies."

34.     A chart summarizing the attachment points and limits of the relevant policies is attached as Exhibit F.

35.     Except as otherwise expressly provided, the Liberty Excess Policy "follows form" to the terms and conditions of the AIG Primary Policy, meaning that it adopts the terms and conditions as if fully set forth in the AIG Primary Policy.

36.     Relevant here, the Liberty Excess Policy provides that "[t]he **Insurer** will pay 100

percent of loss in excess of both the **Underling Limit of Liability** plus the applicable retention or deductible under the **Primary Policy**, up to the Limit of Liability stated in Item 3 of the Declarations."  Ex. E (Liberty Excess Policy, Policy Terms, § 3).  The **Underlying Limit of Liability** is defined as the combined limits of the AIG Primary Policy and OneBeacon Excess Policy, "less any reduction or exhaustion of the limits of liability due to payment of loss under those policies."  Ex. E (Liberty Excess Policy, Policy Terms, § 2.4).

37.     The limits of the D&O Polices are eroded by Loss, including Defense Costs and Pre-Claim Inquiry Costs.

38.     The AIG Primary Policy provides that AIG "shall pay the **Loss** of an **Organization** that arises from any:

> (1) **Claim** (including any **Insured Person Investigation**) made against any **Insured Person** (including any **Outside Entity Executive**) for any **Wrongful Act** of such **Insured Person**; and
>
> (2) **Pre-Claim Inquiry**, to the extent that such **Loss** is either **Pre-Claim Inquiry Costs** or **Liberty Protection Costs**;
>
> but only to the extent that such **Organization** has indemnified such **Loss** of, or paid such **Loss** on behalf of, the **Insured Person**."

Ex. D (AIG Primary Policy, § 1(B)(1)–(2)).

39.     The AIG Primary Policy further provides that it "shall pay the **Loss** of any **Organization**:

> (1) arising from any **Securities Claim** made against such **Organization** for any **Wrongful Act** of such **Organization**;
>
> (2) incurred as **Derivative Investigation Costs**, subject to a $250,000 aggregate sublimit of liability; or
>
> (3) incurred by an **Organization** or on its behalf by any **Executives** of the **Organization** (including through any special committee) as **Defense Costs** in seeking the

8

dismissal of any **Derivative Suit** against an **Insured**."

Ex. D (AIG Primary Policy, § 1(C)(1)–(3)).

40.     The AIG Primary Policy broadly defines "**Claim**," in relevant part, as follows:

> (1) a written demand for monetary, non-monetary or injunctive relief, including, but not limited to, any demand for mediation, arbitration or any other alternative dispute resolution process;
>
> (2) a civil, criminal, administrative, regulatory or arbitration proceeding for monetary, non-monetary or injunctive relief which is commenced by: (i) service of a complaint or similar pleading; (ii) return of an indictment, information or similar document (in the case of a criminal proceeding); or (iii) receipt or filing of a notice of charges;
>
> (3) an **Insured Person Investigation**;
>
> \*\*\*
>
> "**Claim**" shall include any **Securities Claim** and any **Employment Practices Claim**.

Ex. D (AIG Primary Policy, § 13).

41.     A "**Securities Claim**" is defined in the AIG Primary Policy to include a "**Claim**":

> (1) alleging a violation of any law, rule or regulation, whether statutory or common law (including but not limited to the purchase or sale or offer or solicitation of an offer to purchase or sell securities), which is:
>     (a) brought by any person or entity alleging, arising out of, based upon or attributable to the purchase or sale or offer or solicitation of an offer to purchase or sell any securities of an **Organization**; or
>
>     (b) brought by a security holder or purchaser or seller of securities of an **Organization** with respect to such security holder's, purchaser's or Seller's interest in securities of such Organization; or
>
> (2) which is a **Derivative Suit**.

Ex. D (AIG Primary Policy, Endorsement # 18).

42.     The Primary Policy defines "**Pre-Claim Inquiry**" to mean any pre-**Claim**:

> (1) verifiable request for an **Insured Person** of any **Organization**: (a) to appear at a meeting or interview; or (b) produce documents that, in either case, concerns the business of that **Organization** or that **Insured Person's** insured capacities, but only if the request came from any:
>
>> (i) **Enforcement Body**; or
>>
>> (ii) **Organization**, or, on behalf of an **Organization**, by its board of directors (or the equivalent management body) or any committee of the board of directors (or the equivalent management body):
>>
>>> (A) arising out of an inquiry or investigation by an **Enforcement Body** concerning the business of that **Organization** or that **Insured Person's** insured capacities. . .

Ex. D (AIG Primary Policy, § 13).

43.     "**Enforcement Body**," as defined under the AIG Primary Policy, expressly includes the "U.S. Securities and Exchange Commission."

44.     The AIG Primary Policy broadly defines "**Wrongful Act**" to include "any actual or alleged breach of duty, neglect, error, misstatement, misleading statement, omission or act or any actual or alleged" against an Insured Person "in his or her capacity as such" and against AmTrust "solely in regard to a **Securities Claim**." Ex. D (AIG Primary Policy, § 13).

45.     "**Loss**" covered by the AIG Primary Policy is also broadly defined to include "**Defense Costs**, **Crisis Loss**, **Derivative Investigation Costs**, **Liberty Protection Costs** and **Pre-Claim Inquiry Costs**. . ." Ex. D (AIG Primary Policy, § 13).

46.     "**Pre-Claim Inquiry Costs**" are defined in the AIG Primary Policy to include those "reasonable and necessary pre-**Claim** fees, costs and expenses. . .incurred by an **Insured Person** solely in connection with his/her preparation for and response to a **Pre-Claim Inquiry** . . .

including attendance at an interview or meeting requested by an **Enforcement Body**." Ex. D (AIG Primary Policy, § 13).

47.    "**Defense Costs**" are further defined in the AIG Primary Policy, in relevant part, as "reasonable and necessary fees, costs and expenses consented to by the **Insurer** . . .resulting solely from…the investigation, adjustment, defense and/or appeal of a **Claim** against an **Insured**." Ex. D (AIG Primary Policy, § 13).

48.    The AIG Primary Policy also includes an Alternative Dispute Resolution Provision ("ADR Provision"), which dictates that "All disputes or differences which may arise under or in connection with this policy, whether arising before or after termination of this policy, including any determination of the amount of **Loss**, shall be submitted to an alternative dispute resolution (ADR) process as provided in this clause." Ex. D (AIG Primary Policy, § 12(F)(1)).

49.    The ADR Provision in the AIG Primary Policy directs that AmTrust may elect the type of ADR process and that in the event of mediation, "either party shall have the right to commence a judicial proceeding; provided, however, that no such judicial proceeding shall be commenced until the mediation shall have been terminated and at least 90 days shall have elapsed from the date of the termination of the mediation." Ex. D (AIG Primary Policy, § 12(F)(1)).

50.    Finally, the AIG Primary Policy's ADR Provision outlines that "[i]n considering the construction or interpretation of the provisions of this policy, the mediator or arbitrator(s) must give due consideration to the general principles of the law of the **State of Formation** of the **Named Entity**." Here, AmTrust's state of formation is Delaware. Ex. D (AIG Primary Policy, § 12(F)(1)).

**V.    Liberty's Refusal to Reimburse AmTrust for the 2017 Securities Matters**

51.    On or about March 3, 2017, as required by the D&O Policies, AmTrust provided its first written notice of the 2017 Securities Litigation to its insurers for the Policy Period.

52.     AmTrust subsequently provided written notice of the 2017 Derivative Litigation on or about April 27, 2017.

53.     On May 10, 2017, AIG acknowledged that the 2017 Securities Litigation and 2017 Derivative Litigation are covered Claims under the AIG Primary Policy.  AIG also determined that the 2017 Securities Litigation and 2017 Derivative Litigation should be treated as a single Claim. A true and correct copy of AIG's May 10, 2017 letter acknowledging coverage is attached as Exhibit G.

54.     Liberty, for its part, acknowledged notice of the 2017 Securities Litigation and 2017 Derivative Litigation by letter dated August 11, 2017.  Like AIG, Liberty acknowledged that the 2017 Securities Litigation and 2017 Derivative Litigation triggered coverage under the AIG Primary Policy's Insuring Agreements for "Indemnification Of Insured Person Coverage" and "Organization Coverage" (Side B and C coverages, respectively).  Liberty further concluded that the 2017 Securities Litigation and 2017 Derivative Litigation were "Related Claims pursuant to Section 7(b)" of the AIG Primary Policy "and will therefore be treated as a single Claim under the" Liberty Excess Policy.  A true and correct copy of Liberty's August 11, 2017 letter, acknowledging coverage, is attached as Exhibit H.

55.     On September 7, 2017, AmTrust met with its D&O carriers to review the allegations and legal strategy in connection with the 2017 Securities Matters.

56.     At the September 7th meeting, Gibson Dunn, who represented AmTrust in connection with the 2017 Securities Litigation, discussed the coordinated defense strategy for the related 2017 Securities Matters, and provided the D&O carriers with an opportunity to ask questions regarding strategy, counsel's case assessment, and other matters.

57.     This meeting was the first discussion of the 2017 Commission Subpoenas with

AmTrust's D&O insurers, affording the insurers notice of this Pre-Claim Inquiry, and providing AmTrust with consent to the defense.

58.     Liberty's claims examiner and counsel were invited to, and participated in, the September 7th meeting.  Following the presentation, Liberty's counsel independently contacted Gibson Dunn, requesting to be directly apprised of developments in any of the 2017 Securities Matters.

59.     Given that the allegations, time frames, documents, and custodians involved in responding to the 2017 Commission Subpoenas overlapped with those involved in the defense of the 2017 Securities Litigation, and after discussing defense arrangements with AIG, AmTrust expanded Gibson Dunn's role to include defending the Commission investigation along with the 2017 Securities Litigation.  In particular, the 2017 Commission Subpoenas necessitated review and production of the same or related documents, as well as review of the same or related factual background, timeframes, custodians, and issues as those involved in the 2017 Securities Litigation, especially issues of reserving, accounting, and material weaknesses.

60.     As the Commission began identifying witnesses to interview in connection with the 2017 Commission Subpoenas, AmTrust also retained defense counsel to represent those individual directors and officers in their interviews with the Commission.  Those law firms include Cohen & Gresser LLP, Debevoise & Plimpton LLP, and Paul Weiss Rifkind Wharton & Garrison LLP.

61.     After the September 7, 2017 meeting with its D&O carriers, AmTrust, with the assistance of Gibson Dunn and AmTrust's insurance broker, began discussions with its primary D&O carrier, AIG, for reimbursement of defense expenses.  AIG undertook a review of the various 2017 Securities Matters and the potential for coverage.

62.     In due course, AIG began reimbursing the Defense Costs that AmTrust incurred to

defend against the 2017 Securities Litigation and the 2017 Derivative Litigation, as covered under the AIG Primary Policy's Side B and C coverages.

63.     AIG also began reimbursing AmTrust for the costs to prepare and defend individual directors and officers in response to the 2017 Commission Subpoenas as Pre-Claim Inquiry Costs.

64.     Following discussions with AmTrust, however, AIG also acknowledged that certain defense expenses incurred by AmTrust for its own response to the 2017 Commission Subpoenas were related to the defense of the 2017 Securities Litigation.  AIG ultimately agreed with AmTrust that the 2017 Commission Subpoenas necessitated review and production of the same or related documents, as well as review of the same or related factual background, timeframes, custodians, and issues as those involved in the 2017 Securities Litigation, especially issues of reserving, accounting, and material weaknesses.  Moreover, AIG acknowledged that these defense expenses would have been incurred in any event during the defense of the 2017 Securities Litigation.  Thus, AIG found that certain of Gibson Dunn's work was necessary to respond to the 2017 Commission Subpoenas and was also necessary to defend the 2017 Securities Litigation, and thus served dual purposes.

65.     Hence, AIG allocated 50% of the overlapping defense expenses incurred by Gibson Dunn in responding to the 2017 Commission Subpoenas as covered Defense Cost, as those costs were also for the defense of the 2017 Securities Litigation.  This was in addition to, as explained above, AIG's reimbursement to AmTrust of the costs to prepare and defend individual directors and officers in response to the 2017 Commission Subpoenas as Pre-Claim Inquiry Costs.

66.     In or around February 2018, the AIG Primary Policy neared exhaustion, and AmTrust contacted its first-layer excess carrier, OneBeacon, to request that OneBeacon assume reimbursement of defense expenses.

67.    AIG exhausted the full $10 million limit of liability of the AIG Primary Policy reimbursing AmTrust for the cost to defend the 2017 Securities Matters.

68.    OneBeacon, through counsel, sent AmTrust a reservation of rights letter, raising several grounds upon which to deny coverage.

69.    After OneBeacon discussed coverage with AmTrust, consulted with AIG, reviewed invoices and documents, and conducted a thorough independent investigation, OneBeacon concluded that the OneBeacon Excess Policy provided coverage for each of the 2017 Securities Matters.

70.    OneBeacon thus began to reimburse AmTrust for its defense expenses.

71.    As with AIG, OneBeacon began reimbursing the Defense Costs that AmTrust incurred to defend against the 2017 Securities Litigation and the 2017 Derivative Litigation, as covered under the OneBeacon Excess Policy's Side B and C coverages. OneBeacon also reimbursed 100% of the individuals' costs in connection with the 2017 Commission Subpoenas as Pre-Claim Inquiry Costs.

72.    Largely based on the coverage analysis conducted by AIG, OneBeacon agreed to allocate 40% of the overlapping defense expenses incurred for the 2017 Commission Subpoenas as covered Defense Costs, as those costs were also for the defense of the 2017 Securities Litigation. AmTrust did not concede that the remaining defense expenses were not covered but allowed OneBeacon to pay that portion of the overlapping defense expenses for purposes of determining the erosion of OneBeacon Excess Policy's limits.

73.    Then, on or about April 9, 2019, AmTrust notified Liberty that OneBeacon's payment of defense expenses for the 2017 Securities Matters had nearly exhausted the OneBeacon policy limits.  AmTrust explained that, upon exhaustion of the OneBeacon Excess Policy, AmTrust

expected Liberty to assume the obligations under the Liberty Excess Policy, with the same reimbursement allocation agreed to by OneBeacon.

74.     On or about July 10, 2019, OneBeacon paid the remainder of its limits and thus exhausted the full $10 million limit of liability of the OneBeacon Excess Policy reimbursing AmTrust for the cost to defend the 2017 Securities Matters.

75.     On or about April 10, 2019, Liberty asked to review AmTrust's defense-related documents, and reserved its rights to dispute coverage on grounds that (i) the 2017 Securities Matters were allegedly related to a prior notice provided to Liberty under an earlier policy period, or (ii) Liberty was allegedly not properly notified of the 2017 Commission Subpoenas.

76.     AmTrust ardently disagreed with the merits of these positions by letter dated May 2, 2019, explaining, *inter alia*, that AmTrust had kept Liberty fully informed and that Liberty had been actively engaged in discussions concerning the defense of the 2017 Securities Matters, including the 2017 Commission Subpoenas.  Indeed, Liberty participated actively on a call on or about April 19, 2018, with all carriers for the Policy Period, where AmTrust and Gibson Dunn discussed the Commission investigation and its implications for the related securities actions.

77.     In its May 2, 2019 letter, AmTrust also responded to Liberty's written requests for information.

78.     AmTrust and Liberty subsequently entered into a Common Interest and Non-Disclosure Agreement, after which AmTrust produced coverage correspondence and defense invoices to Liberty.  AmTrust also made thousands of pages of documents regarding the 2017 Commission Subpoenas and other earlier subpoenas available for Liberty's review.

79.     Since that May 2019 letter, AmTrust has written Liberty and had numerous calls with Liberty's counsel, making clear that Liberty's reservations of rights were improper and

baseless.

80.     Despite these and other efforts, Liberty still refused to reimburse any of AmTrust's defense expenses.

81.     Liberty's most recent coverage letter dated September 27, 2019, argued that AIG's and OneBeacon's reimbursement of certain expenses related to the 2017 Commission Subpoenas was improper.  As such, Liberty argued that it would not recognize as proper exhaustion the $20 million paid by AIG and OneBeacon to reimburse AmTrust for fees and expenses incurred in defending and responding to the 2017 Securities Matters. Based on that position, Liberty concluded that the Liberty Excess Policy had not been triggered, and it would not reimburse AmTrust for the millions of dollars incurred by AmTrust within Liberty's layer to defend these matters.  A true and correct copy of Liberty's September 27, 2019 letter is attached, as Exhibit I.

82.     Accordingly, AmTrust again notified Liberty that it disputed the merits of Liberty's coverage position.  AmTrust then initiated the ADR Provision of the AIG Primary Policy, and Liberty and AmTrust engaged in mediation on September 22, 2020.

83.     Mediation was unsuccessful and was deemed terminated as of December 15, 2020.

84.     To date, AmTrust has incurred over $9.4 million in Defense Costs and Pre-Claim Inquiry Costs in excess of the Liberty Excess Policy attachment point of $20 million.  AmTrust has met the retention of the AIG Primary Policy and complied with all terms, conditions, and prerequisites to coverage under the D&O Policies.

85.     Nevertheless, Liberty continues to refuse to reimburse any amounts under the Liberty Excess Policy, arguing that its policy has not been triggered and refusing to acknowledge the exhaustion of the AIG Primary Policy and the OneBeacon Excess Policy.

## COUNT I – BREACH OF CONTRACT

86.     AmTrust repeats and re-alleges the allegations contained in the paragraphs above

as if fully set forth herein.

87.    The AIG Primary Policy and OneBeacon Excess Policy have both been fully exhausted by payment of loss by AIG and OneBeacon to reimburse AmTrust for costs and expenses it incurred in defending and responding to the 2017 Securities Matters.

88.    The Liberty Excess Policy is triggered once such Underlying Limit of Liability "is exhausted by reason of [AIG and OneBeacon] paying…the full amount of the Underlying Limit of Liability as a loss." Ex. E at § 4.

89.    Pursuant to the terms of the Liberty Excess Policy, the Liberty policy is now triggered, and Liberty is obligated to pay covered Loss, including Defense Costs and Pre-Claim Inquiry Costs incurred by AmTrust, arising out of the 2017 Securities Matters. Liberty has a continuing obligation to defend and indemnify AmTrust for the pending 2017 Securities Litigation.

90.    AmTrust has complied with all terms, conditions, and prerequisites to coverage under the D&O Policies or is excused from doing so based on coverage declination and other conduct by Liberty.

91.    Liberty has breached the terms of the Liberty Excess Policy by refusing to reimburse AmTrust for Loss incurred in defending and responding to the 2017 Securities Matters, including Defense Costs and Pre-Claim Inquiry Costs, and refusing to acknowledge its obligation to defend and indemnify AmTrust for the pending 217 Securities Litigation.

92.    As a direct and proximate result of Liberty's breach of contract, AmTrust has been injured, and is entitled to an award of damages for breach of the Liberty Excess Policy, in an amount no less than $9.4 million, to be proved on summary judgement or at trial. AmTrust is likewise entitled to an award of pre- and post-judgment interest, its attorneys' fees, and any consequential damages, arising from Liberty's failure to reimburse AmTrust amounts AmTrust

paid defending and responding to the 2017 Securities Matters.

### COUNT II – DECLARATORY JUDGMENT AS TO LIBERTY'S REFUSAL TO ACKNOWLEDGE UNDERLYING EXHAUSTION TO TRIGGER THE LIBERTY EXCESS POLICY

93.     AmTrust repeats and re-alleges the allegations contained in the paragraphs above as if fully set forth herein.

94.     AmTrust has complied with all terms, conditions, and prerequisites to coverage under the D&O Policies or is excused from doing so based on coverage declination and other conduct by Liberty.

95.     No provision in the Liberty Excess Policy grants Liberty the right to reject as inappropriate exhaustion the payment of loss by AIG and OneBeacon under their respective policies, or to dispute that the AIG Primary Policy and OneBeacon Excess Policy limits are not (or should not have been) exhausted.

96.     An actual controversy of a justiciable nature presently exists between AmTrust and Liberty concerning the proper construction of the Liberty Excess Policy, the parties' rights and obligations under that policy, and the impact of those rights and obligations on payment of AmTrust's defense costs and expenses in connection with the 2017 Securities Matters, including the pending 2017 Securities Litigation.

97.     The issuance of declaratory relief by this Court is necessary to resolve the existing controversy among the parties.

98.     Pursuant to 28 U.S.C. § 2201 and Rule 57 of the Federal Rules of Civil Procedure, AmTrust respectfully requests this Court issue a declaration in favor of AmTrust and against Liberty declaring that Liberty is not permitted to dispute exhaustion of the AIG Primary Policy and OneBeacon Excess Policy through payment of defense costs under those Policies by AIG and

OneBeacon, and therefore the Liberty Excess Policy is triggered.    Alternatively, AmTrust respectfully requests this Court issue a declaration that AIG and OneBeacon properly eroded their respective Limits of Liability by the payment of loss, and consequently the Liberty Excess Policy is triggered.

**COUNT III – DECLARATORY JUDGMENT**
**AS TO THE MEANING OF PRE-CLAIM INQUIRY**

99.    AmTrust repeats and re-alleges the allegations contained in the paragraphs above as if fully set forth herein.

100.    AmTrust has complied with all terms, conditions, and prerequisites to coverage under the D&O Policies or is excused from doing so based on coverage declination and other conduct by Liberty.

101.    Pursuant to its terms and conditions, the AIG Primary Policy, which the Liberty Excess Policy follows form, provides coverage for Loss incurred by AmTrust arising from any Pre-Claim Inquiry.

102.    The AIG Primary Policy defines Pre-Claim Inquiry to mean any pre-Claim:

(1) verifiable request for an **Insured Person** of any **Organization**: (a) to appear at a meeting or interview; or (b) produce documents that, in either case, concerns the business of that **Organization** or that **Insured Person's** insured capacities, but only if the request came from any:

(i) **Enforcement Body**; or

(ii) **Organization**, or, on behalf of an **Organization**, by its board of directors (or the equivalent management body) or any committee of the board of directors (or the equivalent management body):

(A) arising out of an inquiry or investigation by an **Enforcement Body** concerning the business of that **Organization** or that **Insured Person's** insured capacities…

20

Ex. D (AIG Primary Policy, § 13).

103.    Liberty has failed to acknowledge that requests from the Commission to interview certain of AmTrust's directors and officers, stemming from the 2017 Commission Subpoenas, constitute a Pre-Claim Inquiry as that term is defined in the AIG Primary Policy.

104.    An actual controversy of a justiciable nature presently exists between AmTrust and Liberty concerning the proper construction of the Pre-Claim Inquiry definition as used in the AIG Primary Policy and the follow-form Liberty Excess Policy, the parties' rights and obligations under those policies, and the impact of those rights and obligations on payment and allocation of AmTrust's still accruing defense expenses in connection with the 2017 Securities Matters.

105.    The issuance of declaratory relief by this Court is necessary to resolve the existing controversy among the parties.

106.    Pursuant to 28 U.S.C. § 2201 and Rule 57 of the Federal Rules of Civil Procedure, AmTrust respectfully requests this Court issue a declaration that the Commission's requests to interview several of AmTrust's officers and directors in further response to the 2017 Commission Subpoenas constitutes a Pre-Claim Inquiry as that term is defined in the AIG Primary Policy.

107.    The issuance of this declaratory relief by this Court is necessary to resolve the existing controversy among the parties and the continuing need for guidance on the proper allocation for reimbursement of AmTrust's expenses in connection with the 2017 Securities Matters.

## COUNT IV – DECLARATORY JUDGMENT
## AS TO COVERAGE FOR DUAL-PURPOSE DEFENSE COSTS

108.    AmTrust repeats and re-alleges the allegations contained in the paragraphs above as if fully set forth herein.

109.    AmTrust has complied with all terms, conditions, and prerequisites to coverage

under the D&O Policies or is excused from doing so based on coverage declination and other conduct by Liberty.

110.     An actual controversy of a justiciable nature presently exists between AmTrust and Liberty concerning the definition of Defense Costs, and whether Defense Costs as defined in the AIG Primary Policy and the follow-form Liberty Excess Policy, includes fees and expenses incurred by AmTrust in defending against the 2017 Commission Subpoenas that were necessary and appropriate for, and aided, the defense of the 2017 Securities and Derivative Litigations.

111.     AmTrust contends that the broad meaning of Defense Costs includes the "reasonable and necessary fees, costs and expenses" incurred by AmTrust in defending the 2017 Securities Litigation (a covered Claim), even if some of the work represented by those fees was also utilized in connection with the defense of and response to the 2017 Commission Subpoenas.

112.     AmTrust had a reasonable expectation that Defense Costs incurred regarding the 2017 Commission Subpoenas that also benefitted the 2017 Securities Litigation would be covered.

113.     The issuance of declaratory relief by this Court is necessary to resolve this existing controversy among the parties.

114.     Pursuant to 28 U.S.C. § 2201 and Rule 57 of the Federal Rules of Civil Procedure, AmTrust respectfully requests this Court issue a declaration in favor of AmTrust and against Liberty declaring that Defense Costs as defined in the AIG Primary Policy and the follow-form Liberty Excess Policy, includes fees and expenses that serve a dual-purpose or overlap – here certain amounts incurred by AmTrust defending and responding to the 2017 Commission Subpoenas that overlapped with or served the dual-purpose of defending the 2017 Securities Litigation (a covered Claim).

## PRAYER FOR RELIEF

**WHEREFORE,** AmTrust prays for judgment as follows:

A.      On the first cause of action, an award of damages in favor of AmTrust and against Liberty in an amount no less than $9.4 million, to be proven on summary judgment or at trial, plus pre- and post-judgment interest at the maximum legal rate and all costs incurred in bringing this action, including attorneys' fees, as permitted under applicable law.

B.      On the second cause of action, AmTrust respectfully requests this Court issue a declaration that Liberty cannot dispute the propriety of AIG's and OneBeacon's payment of their respective limits for the defense of the 2017 Securities Matters, cannot dispute the resulting exhaustion of the AIG Primary Policy and OneBeacon Excess Policy, and consequently the Liberty Excess Policy is triggered.  Alternatively, AmTrust respectfully requests this Court issue a declaration that AIG and OneBeacon properly eroded their respective Limits of Liability by the payment of loss, and consequently the Liberty Excess Policy is triggered.

C.      On the third cause of action, AmTrust respectfully requests that this Court issue a declaration that the Commission's requests to interview several of AmTrust's officers and directors in further response to the 2017 Commission Subpoenas constitutes a Pre-Claim Inquiry as that term is defined in the AIG Primary Policy.

D.      On the fourth cause of action, AmTrust respectfully requests that this Court issue a declaration that Defense Costs as defined in the AIG Primary Policy and the follow-form Liberty Excess Policy, includes fees and expenses that serve a dual-purpose or overlap – here certain amounts incurred by AmTrust defending and responding to the 2017 Commission Subpoenas that overlapped with or served the dual-purpose of defending the 2017 Securities Litigation (a covered Claim).

E.      AmTrust requests such other and further relief as this Court may deem just and proper.

## JURY TRIAL DEMANDED

AmTrust demands a trial by jury, pursuant to Fed. R. Civ. P. 38, on all claims set forth in the Complaint and all other triable issues.

Respectfully submitted,

**BERGER HARRIS LLP**

OF COUNSEL:

Peter M. Gillon (*pro hac vice* to be filed)
Charrise L. Alexander (*pro hac vice* to be filed)
PILLSBURY WINTHROP SHAW PITTMAN LLP
1200 Seventeenth Street NW
Washington, DC 20036
Tel: (202) 663-8000
Fax: (202) 663-8007
peter.gillon@pillsburylaw.com
charrise.alexander@pillsburylaw.com

Dated:  March 15, 2021
Wilmington, Delaware

/s/ David J. Baldwin
David J. Baldwin (DE ID No. 1010)
Peter C. McGivney (DE ID No. 5779)
1105 N. Market Street, 11th Floor
Wilmington, DE  19801
Tel.: (302) 655-1140
Fax: (302) 655-1131
dbaldwin@bergerharris.com
pmcgivney@bergerharris.com

*Attorneys for Plaintiff AmTrust Financial Services, Inc.*