## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

_____
                                           )

AMTRUST FINANCIAL SERVICES, INC.,     )
                                           )

           Plaintiff,                   )

                                           )

v.                                           ) C.A. No. 1-21-cv-00374-CFC

                                           )

LIBERTY INSURANCE UNDERWRITERS    )
INC.,                                           )

                                           )

           Defendant.              )
_____)

## PLAINTIFF AMTRUST FINANCIAL SERVICES, INC.'S MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANT LIBERTY INSURANCE UNDERWRITERS, INC.'S MOTION TO DISMISS

OF COUNSEL:

Peter M. Gillon (*pro hac vice*)
Charrise L. Alexander (*pro hac vice*)
PILLSBURY WINTHROP SHAW
PITTMAN LLP
1200 Seventeenth Street NW
Washington, DC 20036
Tel: (202) 663-8000
peter.gillon@pillsburylaw.com
charrise.alexander@pillsburylaw.com

Dated:  July 20, 2021
Wilmington, Delaware

**BERGER HARRIS LLP**

David J. Baldwin (DE ID No. 1010)
Peter C. McGivney (DE ID No. 5779)
1105 N. Market Street, 11th Floor
Wilmington, DE  19801
Tel.: (302) 655-1140
Fax: (302) 655-1131
dbaldwin@bergerharris.com
pmcgivney@bergerharris.com

*Attorneys for Plaintiff AmTrust*
*Financial Services, Inc.*

## **TABLE OF CONTENTS**

Page

INTRODUCTION .................................................................................1

FACTUAL BACKGROUND ...............................................................3

I.    AmTrust's D&O Insurance Program.............................................3

II.    Liberty's Refusal to Honor Its Coverage Obligations. ...................5

ARGUMENT .......................................................................................8

I.    Delaware Law Applies to this Coverage Dispute. .........................8

II.    Liberty Cannot Exclude the 2017 Securities Matters as "Arising Out of" the Alistair Letter Because They Are Not Fundamentally Identical.......10

III.    Liberty Incorrectly Interprets the Policy Language and the Facts to Deny AmTrust's Claim for Pre-Claim Inquiry Coverage. ...........................16

    A.    AmTrust Provided Adequate Notice of its Pre-Claim Inquiry. ..........19

IV.    AmTrust Pled the Underlying Policies Are Exhausted and Liberty Does Not Have the Right to Second-Guess AIG's and OneBeacon's Payments.......................................................21

    A.    Delaware Interprets Defense Costs Broadly to Include Dual-Purpose Defense Costs. ...............................................................25

CONCLUSION ...................................................................................26

# <u>TABLE OF AUTHORITIES</u>

Page(s)

<u>Cases</u>

*ACE Am. Ins. Co. v. Ascend One Corp.*,
 570 F. Supp. 2d 789 (D. Md. 2008)....................................................14

*In re AmTrust Fin. Servs., Inc. Sec. Litig.*,
 2019 WL 4257110 (S.D.N.Y. Sept. 9, 2019) .....................................14

*In re AmTrust Fin. Servs., Inc. Derivative Litig.*,
 C.A. No. 1:17-cv-00553 (D. Del.) ...............................................*passim*

*In re AmTrust Fin. Servs., Inc. Sec. Litig.*,
 C.A. No. 1-17-cv-01545 .................................................................6, 7

*ARM Props. Mgmt. Group v. RSUI Indem. Co.*,
 2008 WL 5973220 (W.D. Tex. Aug. 25, 2008).................................24

*AXIS Reinsurance Co. v. Northrop Grumman Corp.*,
 2020 WL 5509743 (9th Cir. Sept. 14, 2020) .....................................23

*Bell Atlantic Corp. v. Twombly*,
 550 U.S. 544 (2007).........................................................................18

*Cent. Mortg. Co. v. Morgan Stanley Mortg. Capital Hldgs. LLC*,
 27 A.3d 531 (Del. 2011) ..................................................................21

*Chartis Specialty Ins. Co. v. Scott Homes Multifamily Inc.*,
 2014 WL 12729090, at *4 (D. Ariz. Mar. 31, 2014).........................24

*Edward E. Gillen Co. v. Ins. Co. of Pa.*,
 2011 WL 1694431, at *4 (E.D. Wis. May 3, 2011) .....................23, 24

*Emmis Commc'ns Corp. v. Ill. Nat'l Ins. Co.*,
 323 F. Supp. 3d 1012 (S.D. Ind. 2018).............................................15

*Fansler v. N. Am. Title Ins. Co.*,
 2020 Del. Super. LEXIS 241 (Del. Super. May 18, 2020)................20

*Ferrellgas Partners L.P. v. Zurich Am. Ins. Co.*,
 2020 WL 363677 (Del. Super. Jan. 21, 2020)...................................12

ii

*First Bank of Del., Inc. v Fid. & Deposit Co. of Md.*,
    2013 WL 5858794, at *3 (Del. Super. Oct. 30, 2013).........................................10

*Hertz Glob. Holdings, Inc. v. Nat'l Union Fire Ins. Co. of Pittsburgh*,
    2021 WL 1198802, at *3 (S.D.N.Y. Mar. 30, 2021).........................................26

*Hishon v. King & Spalding*,
    467 U.S. 69 (1984)..............................................................................................19

*Hrobuchak v. Fed. Ins. Co.*,
    2010 WL 4237435, *4 (M.D. Pa. Oct. 21, 2010) .......................................14, 15

*IDT Corp. v. U.S. Specialty Ins. Co.*,
    2019 WL 413692, at *6 (Del. Super. Jan. 31, 2019) ...........................................9

*Kehr Packages, Inc. v. Fidelcor, Inc.*,
    926 F.2d 1406 (3d Cir. 1991) ............................................................................16

*Legion Partners Asset Mgmt., LLC v. Underwriters at Lloyds London*,
    2020 WL 5757341, at *11 n.87 (Del. Super. Sept. 25, 2020) .....................25, 26

*Mayer v. Belichick*,
    605 F.3d 223 (3d Cir. 2010) .........................................................................22, 26

*Med. Depot, Inc. v. RSUI Indem. Co.*,
    2016 WL 5539879, at *13-14 (Del. Super. Sept. 29, 2016).............................11

*Northrop Grumman Innovation Sys., Inc. v. Zurich Am. Ins. Co.*,
    2021 WL 347015, at *8 (Del. Super. Feb. 2, 2021) ...................................*passim*

*Pfizer Inc. v. Arch Ins. Co.*,
    2019 WL 3306043, at *18 (Del. Super. July 23, 2019)...........................9, 10, 12

*RSUI Indem. Co. v. Murdock*,
    248 A.3d 887 (Del. 2021) ..............................................................................9, 20

*Sonitrol Holding Co. v. Marceau Invs.*,
    607 A.2d 117 (Del. 1992) ...................................................................................15

*State Farm Mut. Auto Ins. Co. v Johnson*,
    320 A.2d 345 (Del. 1974) ...................................................................................20

*U.S. Fid. & Guar. Co. v. Treadwell Corp.*,
    58 F. Supp. 2d 77 (S.D.N.Y. 1999) ...................................................................23

*UNR Indus., Inc. v. Cont'l Ins. Co.*,
    1988 WL 121574, at *16 (N.D. Ill. Nov. 9, 1988) .............................................24

*Zahoruiko v. Fed. Ins. Co.*,
    2017 WL 776645, at *5 (D. Conn. Feb. 28, 2017) .............................................15

Statutes and Codes

Code of Federal Regulations
    Title 17, section 240.10A-3(b)(3) ......................................................................11
    Title 17, section 240.10A-3(b)(4) ......................................................................11

Rules and Regulations

Federal Rules of Civil Procedure
    Rule 8(a)(2) .........................................................................................................19

Other Authorities

Susan Sclafane, *As Investigation-Cost Coverages Evolve, Prices on
    Existing D&O Solutions Drop*, Propertycasualty360.com; available
    at: http://www.propertycasualty360.com/2011/05/20/as-
    investigation-cost-coverages-evolve-prices-on-
    e?&slreturn=1517852802 .............................................................................4, 18

Plaintiff AmTrust Financial Services, Inc. ("AmTrust") submits this memorandum in opposition to Defendant Liberty Insurance Underwriters, Inc.'s ("Liberty") Motion to Dismiss.

## INTRODUCTION

AmTrust seeks to enforce its rights under the D&O policy it purchased from Liberty, for expenses incurred defending against a securities class action, a derivative class action, and preparing and defending executives for interviews with the Securities and Exchange Commission ("Commission"). Liberty's follow-form excess policy mandates that Liberty pay loss up to the full limits of the policy once the underlying limits are exhausted. The two underlying carriers paid their full $10 million limits reimbursing AmTrust for its defense expenses years ago. However, on spurious grounds, Liberty refuses to reimburse any amount to AmTrust prompting this breach of contract and declaratory judgment action.

Liberty now seeks dismissal of AmTrust's First Amended Complaint (D.I. # 19) ("Amended Complaint") in its entirety – on the ground that AmTrust's claim is excluded because it "arises out of" an earlier notice of circumstances (that was withdrawn). However, Liberty's motion is defective legally and factually. The Delaware Supreme Court has made clear that Delaware law governs D&O claims by Delaware insureds. Likewise, Delaware has adopted a bright-line test for determining whether a claim is deemed to "arise out of" an earlier claim, requiring

1

the claims be "fundamentally identical."  Here, the relevant matters arise in different time periods, involve different claimants, involve distinct allegations of wrongdoing, allege different harm, and seek entirely divergent remedies.  Thus, Liberty has not and cannot meet its burden of excluding AmTrust's claim because the matters do not even come close to being fundamentally identical.

Liberty makes several other strained arguments as to why AmTrust has not triggered its policy.  Namely, Liberty argues that it is not required to recognize amounts paid by the underlying carriers as covered loss because those carriers should not have reimbursed certain of AmTrust's defense expenses.  Again, Liberty ignores the overwhelming weight of authority, and the plain reading of the Liberty policy, which make clear that Liberty is not permitted to second-guess payments made by underlying carriers.  Liberty's motion wrongly attacks the well-pled allegations of AmTrust's Amended Complaint and improperly requests this Court resolve the merits of the very legal and factual arguments that are the basis of this litigation.

Liberty goes on to mischaracterize and omit facts concerning AmTrust's claim for Pre-Claim Inquiry Coverage, and improperly requests this Court resolve the merits of Liberty's fact-based affirmative defense of defective notice by way of motion to dismiss.  Of course, AmTrust's allegation that it provided timely notice to its D&O carriers, including Liberty, of the Commission's 2017 subpoenas and

requests to interview certain executives must be accepted as true.  *See* Amended Complaint, ¶¶ 60, 84, 96.  Beyond the well-pled allegations of the Amended Complaint, the record will show that Liberty received timely notice of the Commission's 2017 subpoenas, approved the selection of defense counsel, and participated in discussions of the claim with defense counsel.  For that reason, it would be inappropriate to address Liberty's affirmative defense without a developed factual record, including a demonstration by Liberty that it suffered prejudice because of the purportedly faulty notice.

Liberty's Motion to Dismiss should therefore be denied.

## FACTUAL BACKGROUND

**I.      AmTrust's D&O Insurance Program.**

AmTrust is a property and casualty insurance holding company incorporated in Delaware.  *Id.*, ¶¶ 10, 15.  AmTrust paid substantial premiums to Liberty for an excess D&O policy effective September 30, 2016 to October 21, 2017 ("Policy Period")[1] to protect against the potential risk of loss from securities-related Claims. The policy included supplemental coverage for Pre-Claim Inquiries. Usually, to trigger D&O policies there must be a Claim – *i.e.*, "someone ha(s) to be named in

---

[1]  *See id.*, Ex. E., End. 7.

an SEC investigation."[2]  But, Pre-claim inquiry extends coverage to include any type of request for an interview and "any type of legal costs" a company incurs for its interviews of directors and officers.  *Id*.

The Liberty policy sits excess of a primary policy issued by Illinois National Insurance Company ("AIG") (the "Primary Policy") and a first-layer excess policy issued by Atlantic Specialty Insurance Company ("OneBeacon") (the "OneBeacon Excess Policy," together with the "Primary Policy," referred to herein as the "Underlying Policies").  Amended Complaint, ¶¶ 31–33; Ex. D.

The Primary Policy, in relevant part, provides coverage for Loss incurred by AmTrust arising from (i) any Claim made against an Insured Person for any Wrongful Act or Pre-Claim Inquiry that AmTrust indemnifies (Side B), and (ii) any Securities Claim against AmTrust (Side C).  *Id.*, Ex. D at § 1.  Loss is defined to include, "damages, settlements, judgments . . .**Defense Costs**. . .and **Pre-Claim Inquiry Costs**."  *Id.*, at § 13. Defense Costs include the "reasonable and necessary fees, costs and expenses," including the cost of e-discovery services, resulting from "the investigation, adjustment, defense and/or appeal of a **Claim** against an **Insured**."  The Primary Policy defines Pre-Claim Inquiry to mean any pre-Claim:

---

[2] Susan Sclafane, *As Investigation-Cost Coverages Evolve, Prices on Existing D&O Solutions Drop*, Propertycasualty360.com; available at: http://www.propertycasualty360.com/2011/05/20/as-investigation-cost-coverages-evolve-prices-on-e?&slreturn=1517852802

(1) verifiable request for an **Insured Person** of any **Organization**: (a) to appear at a meeting or interview; or (b) produce documents that, in either case, concerns the business of that **Organization** or that **Insured Person's** insured capacities, but only if the request came from any:

    (i)    **Enforcement Body**; or
    (ii)    **Organization**, or, on behalf of an **Organization** . . .
        (A). arising out of an inquiry or investigation by an **Enforcement Body** concerning the business of that **Organization** or that **Insured Person's** insured capacities;

*Id.*

Finally, Pre-Claim Inquiry Costs include those "reasonable and necessary pre-**Claim** fees, costs and expenses. . .incurred by an **Insured Person** solely in connection with his/her preparation for and response to a **Pre-Claim Inquiry** . . . including attendance at an interview or meeting requested by an **Enforcement Body**." *Id.*

The Liberty excess policy has a $10 million Limit of Liability, follows-form to the Primary Policy, and contains no different terms relevant to this coverage dispute (the "Liberty Excess Policy"). *Id.*; Ex. E.  The Liberty Excess Policy applies once such Underlying Limit of Liability "is exhausted by reason of [AIG and OneBeacon] paying…the full amount of the Underlying Limit of Liability as a loss." *Id.* at § 4.

## II.    Liberty's Refusal to Honor Its Coverage Obligations.

In the Spring of 2016, AmTrust switched auditors from BDO USA, LLP to KPMG.  Prior to the change, AmTrust followed the advice of BDO with respect to

5

its accounting practices.  KPMG offered a different opinion concerning subjective accounting judgments, and consistent with the new auditor's view, AmTrust restated its financials.  *See* Amended Complaint, ¶ 16.  The restatements were prompted by two changes to AmTrust's accounting policies: (1) timing of recognition of the portion of warranty contract revenue associated with administration services – which AmTrust previously recognized at the time of sale, rather than over the life of the contract; and (2) accrual of expenses for discretionary bonuses which were expensed in the year paid, rather than as accrued.  *Id.*, Exs. A, ¶ 87, and C, ¶ 201.

Following the restatements, AmTrust's stock price declined, resulting in AmTrust and several of its directors and officers being named as defendants in securities and derivative litigation.  *Id.*; Exs. A, ¶ 15, and C, ¶¶ 13–22.  The securities suits were consolidated into a case styled *In re AmTrust Financial Services, Inc. Securities Litigation*, C.A. No. 1-17-cv-01545, in the United States District Court, Southern District of New York ("2017 Securities Litigation").  The related derivative litigation was similarly consolidated into an action styled *In re AmTrust Financial Services, Inc. Derivative Litigation*, C.A. No. 1:17-cv-00553 (D. Del.) ("2017 Derivative Litigation").  Both cases have since been dismissed.[3] The Commission began to investigate AmTrust's restatements, serving subpoenas on

---

[3] The 2017 Securities Litigation is now on appeal.

AmTrust to produce numerous categories of documents, including, *inter alia*, documents concerning, warranty premiums and losses, earning patterns for premiums in the warranty business, and setting of loss ratios for program business ("2017 Commission Subpoenas").  *Id.*, ¶¶ 25–26. [4]  The Commission eventually took testimony from AmTrust's officers and others.  *Id.*, ¶ 27.  While the Commission had investigated AmTrust for other matters in prior years, this was the first time the Commission sought to interview any of AmTrust's executives.  And as noted, the 2017 Commission Subpoenas related to financial restatements made by AmTrust in early 2017.  *Id.*, ¶ 26.

AmTrust seeks coverage under its excess D&O insurance policy, issued by Liberty, for expenses incurred (or to be incurred) in defending each of the 2017 Securities Matters.  The two underlying insurers have paid their full limits reimbursing AmTrust for the defense of the 2017 Securities Matters.  *Id.*, ¶ 4. And, as of the filing of AmTrust's Amended Complaint, AmTrust's defense expenses exceed Liberty's attachment point, totaling more than $39 million.  *Id.*, ¶ 5.  AmTrust's defense expenses reached the attachment point of Liberty's policy in July of 2019, but since then, Liberty has refused to pay any amount, instead

---

[4] The 2017 Securities Litigation, 2017 Derivative Litigation, and 2017 Commission Subpoenas are collectively referred to as the 2017 Securities Matters.

asserting a baffling and evolving range of arguments depriving AmTrust of its coverage rights.

In its motion, Liberty seeks to exclude the 2017 Securities Matters as arising out of a much-older and since-withdrawn notice of circumstance:  a letter dated December 18, 2014 ("Alistair Letter") that consisted of fabricated allegations by certain short sellers of deficiencies in, *inter alia*, AmTrust's accounting for deferred acquisition costs, of reinsurance assets related to Maiden Holdings, and loss reserves assumed in acquisitions.  *Id.*, ¶¶ 79–80; Ex. L at 2.  The Alistair Letter does not address the accounting practices at issue in the 2017 Securities Matters.  *Id*, ¶¶ 80–82.  Liberty then seeks to challenge the propriety of payments made by AIG and OneBeacon under the Underlying Policies.  Liberty also claims that AmTrust failed to adequately plead exhaustion and notice.  As explained below, this Court should reject these arguments and deny Liberty's Motion to Dismiss ("MTD").

## **ARGUMENT**

## I.    **Delaware Law Applies to this Coverage Dispute.**

Only Delaware law can apply to the interpretation of the D&O policy provisions at issue here.  The Delaware Supreme Court has determined that in the D&O insurance context, Delaware takes overriding interest in disputes involving coverage for claims asserting fiduciary mismanagement of Delaware corporations.

8

*RSUI Indem. Co. v. Murdock*, 248 A.3d 887, 900–01 (Del. 2021); *accord Pfizer Inc. v. Arch Ins. Co.*, 2019 WL 3306043, at *18 (Del. Super. July 23, 2019) ("Where D&O coverage is at issue 'and the choice of law is between the headquarters and the state of incorporation, the state of incorporation has the most significant relationship.'"); *IDT Corp. v. U.S. Specialty Ins. Co.*, 2019 WL 413692, at *6 (Del. Super. Jan. 31, 2019).  Because AmTrust is incorporated in Delaware and this dispute relates to D&O liability insurance, Delaware law applies to the interpretation of policy terms here.  *See id.*

Importantly, attempting to sidestep Delaware's more stringent "fundamentally identical" standard for "arising out of language," Liberty argues that "New York and Delaware are in harmony" on the fundamental contractual principals and therefore a choice-of-law analysis is unnecessary.  MTD at 12.  This is unequivocally false.

Delaware law provides that, when an insurer invokes an exclusion resting on the "relatedness" of Wrongful Acts, coverage **will only be precluded where the two underlying claims are** "**fundamentally identical**."  *Northrop Grumman Innovation Sys., Inc. v. Zurich Am. Ins. Co.*, 2021 WL 347015, at *8 (Del. Super. Feb. 2, 2021) (emphasis added).  Liberty further mischaracterizes Delaware law by arguing that Delaware and New York courts agree that this "arising out of" language "should be interpreted broadly," requiring "some meaningful linkage

9

between the two conditions." MTD at 12. Delaware courts have repeatedly rejected such a broad reading of 'arising out of' language that would preclude coverage for claims simply because they "share any commonality." *Pfizer*, 2019 WL 3306043, at *9 ("This reading is strained, ***uncharacteristically broad***, and runs afoul of this Court's prior interpretation standards set forth in previous cases.") (emphasis added).

## II. Liberty Cannot Exclude the 2017 Securities Matters as "Arising Out of" the Alistair Letter Because They Are Not Fundamentally Identical.

It is well-established canon in insurance policy interpretation that insurers bear the burden to prove exclusions apply, and exclusionary language will be construed narrowly. *First Bank of Del., Inc. v Fid. & Deposit Co. of Md*., 2013 WL 5858794, at *3 (Del. Super. Oct. 30, 2013). Liberty argues, despite this heavy burden, and Delaware's "fundamentally identical" standard for "arising out of" language, the Alistair Letter and the 2017 Securities Matters "all 'arise out of' the same circumstances" in three respects: (1) they both concern AmTrust's alleged improper accounting and its lack of controls over its financial reporting; (2) a linkage exists between both, purportedly "detailed in the underlying pleadings" because "the circumstances forming the basis of the Alistair Letter form the core of the allegations at issue" in the 2017 Securities Matters; and (3) that somehow AmTrust's public description of the Commission's investigation over years proves that the 2017 Securities Litigation and 2017 Commission Subpoenas form the basis

10

of the Alistair Letter.  *See* MTD at 13–14.  These arguments all fail.

First, "[t]o determine whether two claims are fundamentally identical, Delaware courts look to the subject of the claims to see if they are 'the exact same' and do not merely share 'thematic similarities.'"  *Northrop*, 2021 WL 347015, at *11.  To the extent that the Alistair Letter and the 2017 Securities Matters both concern "improper accounting" and "lack of controls," those similarities are, ***at most***, thematic in nature and thus insufficient to deem them fundamentally identical as a matter of law.  The subject of the Alistair Letter was an explicit demand to an AmTrust audit committee, under 17 C.F.R. §§ 240.10A-3(b)(3) and 240.10A-3(b)(4), to "engage independent counsel and other advisers" for an accounting audit.  Neither of those demands is made anywhere in the 2017 Commission Subpoenas or other 2017 Securities Matters.  *See id.*, ¶¶ 16–17; 22–23; and 25–30.  That difference in legal claims alone defeats Liberty's assertion that they arise out of the same circumstances.  *See Med. Depot, Inc. v. RSUI Indem. Co.*, 2016 WL 5539879, at *13-14 (Del. Super. Sept. 29, 2016) (Although arising from shared facts, "a wrongful death and products liability action" was not fundamentally identical to "lawsuit alleging violations of California's Business & Professions Code").

Second, the fact that the 2017 Securities Matters involve ***different*** claimants asserting ***separate*** legal claims regarding ***different*** alleged misrepresentations in

*different* financial records further demonstrates that the 2017 Securities Matters are not fundamentally identical to the Alistair Letter. *See Ferrellgas Partners L.P. v. Zurich Am. Ins. Co.*, 2020 WL 363677, at *8 (Del. Super. Jan. 21, 2020) (observing that the actions in *Pfizer* were not fundamentally identical because they concerned "[d]*ifferent* plaintiffs," who "brought *separate* actions," regarding "*different* misrepresentations about *different* products and associated health risks.").

Alistair Capital, the author of the letter, is not a plaintiff or enforcement party to the 2017 Securities Matters. Amended Complaint, ¶¶ 79–80. The Alistair Letter consisted of manufactured allegations by short sellers of deficiencies in accounting for deferred acquisition costs, valuation of life settlement contracts, accounting of reinsurance assets related to Maiden Holdings, accounting of Luxembourg Reinsurance Captives, and accounting for loss reserves assumed in acquisitions. *Id.*, ¶¶ 79–80; Ex. L at 2.

In contrast, the 2017 Securities Litigation and 2017 Derivative Litigation arose because AmTrust restated its prior financial statements based upon a change to its accounting treatment of discretionary bonuses, and revenue recognition in the warranty segment of its business. *Id.*, ¶¶ 22, 81. In fact, plaintiffs' damages in the 2017 Securities and Derivative Litigation are pled as a direct result of AmTrust's early 2017 announcements that it was restating certain of its financials:

> In response to each of these revelations, the price of AmTrust common stock fell as follows: (i) on February 27, 2017, shares of AmTrust common stock fell from $27.66 per share the previous trading day, to close at $22.34 per share, down approximately $5.32 per share, or *19.2%*. . . .

*Id.*, Ex. A, ¶ 15; Ex. C, ¶¶ 13–22. The 2017 Commission Subpoenas were issued after, and in response to AmTrust's restatements, and specifically sought information regarding AmTrust's internal controls, warranty premiums and losses, and the setting of loss ratios for program business – all subjects of the restatements. *Id.*, ¶¶ 26, 67.  Given that the 2017 Commission Subpoenas were prompted by the 2017 restatements, perforce the topics addressed were not addressed in any prior investigation by the Commission.  So, while the Commission had previously investigated AmTrust regarding other aspects of its business, the 2017 Commission Subpoenas sought specific information related to the 2017 Securities and Derivative Litigation.  Thus, Liberty's reliance on AmTrust's public disclosure of the Commission's years long prior investigation is misplaced.  MTD at 15.

Third, this Court would be particularly misled here were it to rely on self-serving characterizations of the facts alleged in the underlying pleadings as argued by Liberty its MTD.  *See Northrop*, 2021 WL 347015, at *11 ("underlying claimant's 'unilateral characterizations' of the claims need not be credited.).  Instead, the Court should compare the complaints and the Alistair Letter and draw reasonable inferences from the documents as whole.  *See id*.

As Liberty concedes, Judge Kaplan rejected plaintiffs' assertion that the restatements were part of a pattern of misconduct evidenced by Alistair Letter. *See* MTD at 6 (Liberty acknowledges that Judge Kaplan "ultimately held that the irregular accounting and internal controls cited in the Alistair Letter did not support a finding of securities violations."). He found the Alistair Letter presented ***materially distinct*** claims from those alleged in the 2017 Securities Matters:

> "The Alistair letter was concerned with amounts on AmTrust's financial statements that 'appear[ed] to be irreconcilable with one another'…This was nothing more than speculation ***disconnected from any concrete suggestion of any existing issue*** regarding the recognition of certain expenses."

*In re AmTrust Fin. Servs., Inc. Sec. Litig.*, 2019 WL 4257110, at *20 (S.D.N.Y. Sept. 9, 2019) (emphasis added).

To bridge this chasm, Liberty characterizes the Alistair Letter as at least "factual background" for or a "warning 'borne out'" by the alleged misstatements at issue in the 2017 Securities Matters. *See* MTD at 6–7. But as other courts have reasoned, a claim is ***not*** related to another claim if it only provides background context for or a warning of alleged corporate wrongdoing at issue in the latter. *See e.g., Hrobuchak v. Fed. Ins. Co.*, 2010 WL 4237435, *4 (M.D. Pa. Oct. 21, 2010) ("One suit over your business practices . . . cannot mean that your insurer is forever immune from having to extend coverage in future suits."); *ACE Am. Ins. Co. v. Ascend One Corp.*, 570 F. Supp. 2d 789, 800 (D. Md. 2008) (if every claim

that alleges a general pattern of business practices is deemed to be related to every other claim reciting that pattern, coverage becomes virtually worthless).  Besides, "[t]he coverage does not depend upon the pleader's art but rather upon underlying facts." *Zahoruiko v. Fed. Ins. Co*., 2017 WL 776645, at *5 (D. Conn. Feb. 28, 2017). So too with the Alistair Letter and the 2017 Securities Matters.

AmTrust is a property and casualty insurance holding company – accounting for loss reserves and related accounting practices are fundamental to its business. If every litigation or demand that alleged wrongdoing regarding AmTrust's accounting or reserving were deemed to "arise out of" the same matter, coverage would be illusory. *See Hrobuchak*, 2010 WL 4237435, at *4 (*rejecting* argument that set of lawsuits against a debt collector all 'arose out of' the same circumstances solely because they alleged wrongful "debt-collection business" practices, as that "would render the policy essentially a nullity…any suit brought against [the insured] would almost by definition involve their core business model."); *Emmis Commc'ns Corp. v. Ill. Nat'l Ins. Co.*, 323 F. Supp. 3d 1012, 1027 (S.D. Ind. 2018) (A policy will not be interpreted so broadly where "doing so would lead to the exclusion of virtually any lawsuit filed against [the insured]."); *see also Sonitrol Holding Co. v. Marceau Invs.*, 607 A.2d 117, 1183 (Del. 1992) ("[A] contact should be interpreted in such a way as to not render any of its

provisions illusory or meaningless" or in a way that "frustrates the meaning, purpose and intent of the parties' agreement.").

Liberty has not and cannot meet its burden to exclude the 2017 Securities Matters as 'arising out of' the Alistair Letter.

## III.   Liberty Incorrectly Interprets the Policy Language and the Facts to Deny AmTrust's Claim for Pre-Claim Inquiry Coverage.

Liberty claims that AmTrust is not entitled to Pre-Claim Inquiry coverage because AmTrust allegedly failed to plead it indemnified directors and officers for a Pre-Claim Inquiry and failed to provide written notice.  *See* MTD at 17-22.  As the party moving to dismiss, Liberty bears the burden to show that no claim has been stated.  *Kehr Packages, Inc. v. Fidelcor, Inc*., 926 F.2d 1406, 1409 (3d Cir. 1991).  Liberty has not met that burden.

A Pre-Claim Inquiry is defined to include a "verifiable request for an **Insured Person** of any **Organization**: (a) to appear at a meeting or interview; or (b) produce documents that, in either case, concerns the business of that **Organization** or that **Insured Person's** insured capacities."  Amended Complaint, Ex. D at § 13.  The request can come from either an "Enforcement Body" or AmTrust.  *Id*.  Moreover, "Pre-Claim Inquiry Costs" include those "reasonable and necessary Pre-Claim fees, costs and expenses. . .incurred by an Insured Person solely in connection with his/her preparation for and response to a **Pre-Claim Inquiry** . . . including attendance at an interview or meeting requested by an

16

**Enforcement Body**." *Id.* AmTrust is entitled to coverage if it demonstrates that the Commission or the company (AmTrust) requested interviews or meetings with "Insured Persons," related to those individual's duties or AmTrust's business, all in response to an investigation of AmTrust by the Commission. AmTrust has pled each element triggering coverage.

In 2017, the Commission issued subpoenas to AmTrust following the filing of the 2017 Securities Litigation and 2017 Derivative Litigation. Amended Complaint, ¶¶ 25-26. Those subpoenas sought documents from AmTrust. *Id.* Sometime after the issuance of the 2017 Commission Subpoenas, the Commission identified several directors and officers it wanted to interview, including former Chief Financial Officer, Ronald Pipoly, and former Deputy Chief Financial Officer, Zachary Wolf. *Id.*, ¶ 27. The Commission made those requests directly to Gibson Dunn, AmTrust's counsel for the 2017 Securities Litigation and the 2017 Commission Subpoenas. *Id.*, ¶ 115. AmTrust made those executives available for interviews and meetings with the Commission. *Id.* AmTrust retained counsel for those individuals, including Cohen & Gresser LLP, Debevoise & Plimpton LLP, and Paul Weiss Rifkind Wharton & Garrison LLP to prepare and defend those executives, and indemnified those costs.[5] *Id.*

---

[5] This defense cost summary referenced by Liberty was created for information purposes and does not contain the total defense expenses incurred to date.

Interestingly, Liberty implies that to trigger Pre-Claim Inquiry coverage, the request for an interview by the Commission must come directly from the Commission to the Insured Person. *See* MTD at 17. That interpretation is inconsistent with the provision itself, which provides a Pre-Claim Inquiry can be triggered by AmTrust's request of an Insured Person to be interviewed. *See* Amended Complaint, Ex. D at § 13 ("verifiable request for an **Insured Person** of any **Organizatio**n: (a) to appear at a meeting or interview. . .buy only if the request came from any. . .**Enforcement Body** or **Organization**"). It is also inconsistent with the very purpose of the add on Pre-Claim Inquiry coverage, which does not require individuals be the target of the investigation and instead is intended to provide broad coverage for informal investigations – like the one here. *See* Sclafane*, supra* at n.2.

AmTrust has adequately pled a Pre-Claim Inquiry and Liberty's MTD should be denied.

Finally, AmTrust is not required to itemize the exact amounts it indemnified in its Amended Complaint.[6] The Federal Rules only require a complaint contain a

---

[6] Liberty's assertions that AmTrust failed to specify amounts it indemnified is belied by the Amended Complaint, which alleges that "AmTrust has incurred over $9.4 million in Defense Costs and Pre-Claim Inquiry Costs in excess of the Liberty Excess Policy attachment point of $20 million." Amended Complaint, ¶ 92. Moreover, AmTrust is not required to outline in line-item detail its damages in its Amended Complaint. *See Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570 (2007).

"short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2).  Dismissal can be granted "only if it is clear that no relief could be granted under any set of facts that could be proved consistent with the allegations." *Hishon v. King & Spalding*, 467 U.S. 69, 73 (1984).  Liberty has not met that standard.  *See* Amended Complaint, ¶¶ 29, 102, 116.

### A.    AmTrust Provided Adequate Notice of its Pre-Claim Inquiry.

In an effort to draw the Court into deciding the MTD on the merits of their affirmative notice defense, Liberty characterizes AmTrust's timely notice allegation as conclusory, and complains that notice was defective because it was not in writing.  MTD at 18-19. However, AmTrust provided actual or constructive notice of the 2017 Securities Matters to its D&O carriers for the Policy Period and has adequately stated those facts in its Amended Complaint.  Amended Complaint, ¶¶ 53-54, 60 (AmTrust provided "notice to its D&O insurers, including Liberty, of the extremely sensitive 2017 Commission Subpoenas . . . affording them notice of the matter as a potential Pre-Claim Inquiry, and securing their consent to retain the appropriate defense counsel.").  AmTrust has met its burden.

Importantly, the record reflects extensive efforts by AmTrust to keep Liberty informed of developments in the 2017 Securities Matters, including the 2017 Commission Subpoenas.  *See id.*; *see also Northrop*, 2021 WL 347015, at *15 (denying motion for failure to show prejudice where the insured had "gathered an

array of [] facts suggesting the Insurers were notified—directly or constructively—but did nothing."). AmTrust is thus entitled to the presumption associated with its reasonable expectations of coverage. *RSUI Indem. Co.*, 248 A.3d at 906 ("Insurance contracts should be interpreted as providing broad coverage to align with the insured's reasonable expectations.").

Liberty is requesting this Court deprive AmTrust of the valuable coverage for which it paid substantial premiums, on the hyper-technical ground that notice was not in writing – even after Liberty acknowledged it received notice of the 2017 Securities Matters and participated in discussions on defense strategy. *See, e.g.*, Amended Complaint, Ex. K. It is to prevent insurance companies from depriving insureds based on such outrageous arguments that Delaware courts have a longstanding rule that defective notice is excused in the absence of prejudice to the insurer. *See, e.g., State Farm Mut. Auto Ins. Co. v Johnson*, 320 A.2d 345, 347 (Del. 1974) (the "question of prejudice" is "paramount" where the insurer attempts to avoid its coverage obligations by alleging defective notice because "[t]here can be no doubt that the purpose of a notice provision is to protect an insurance company from any prejudice resulting from an inordinate lapse of time between an accident and the company's awareness thereof."). It follows that demonstrating prejudice is equally important where the alleged defect is not "lack of notice," but as here, the manner of notice. *See Fansler v. N. Am. Title Ins. Co.*, 2020 Del.

20

Super. LEXIS 241, at *11 (Del. Super. May 18, 2020).  Liberty has failed to allege

prejudice, nor could it, when it had every opportunity to participate in defense

strategy – even as the second-excess insurer.

Any further inquiry into the adequacy of the form of AmTrust's notice and

whether Liberty has been materially prejudiced by the form, are all contested

issues of fact that cannot be resolved on a motion to dismiss.  *Cent. Mortg. Co. v.*

*Morgan Stanley Mortg. Capital Hldgs. LLC*, 27 A.3d 531, 536 (Del. 2011)

("Whether this notice was sufficient as a matter of fact is an inquiry more

appropriate to a later stage of the proceeding.").  In any event, even if Liberty were

correct that AmTrust's claim for Pre-Claim Inquiry coverage were somehow

barred for lack of written notice and could demonstrate prejudice as a result, that

would not dispose of this litigation.  Liberty does not dispute it owes outstanding

Defense Costs for the 2017 Securities and Derivative Litigation.  Amended

Complaint, ¶¶ 5, 92.  Liberty also has an ongoing obligation to defend and

indemnify AmTrust for the pending appeal of the 2017 Securities Litigation.  *Id.*

Thus, Liberty's MTD should be denied.

## IV. AmTrust Pled the Underlying Policies Are Exhausted and Liberty Does Not Have the Right to Second-Guess AIG's and OneBeacon's Payments.

Liberty attempts to evade the very legal issue before this Court and seeks to

dismiss this action by mischaracterizing AmTrust's Amended Complaint.  In its

motion, Liberty alleges that "AmTrust has not plausibly alleged that the $20

21

million underlying limits are exhausted through payment(s) of covered Loss."
MTD at 16.  The facts, the law, and the Liberty Excess Policy language hold
otherwise.

As AmTrust alleges, "AIG fully exhausted the $10 million limit of liability
of the Primary Policy, partially reimbursing AmTrust for the cost to defend the
2017 Securities Matters."  Amended Complaint, ¶ 70; Ex. I.  AmTrust also alleges
"OneBeacon paid the remainder of its limits and thus exhausted the full $10
million limit of liability of the OneBeacon Excess Policy partially reimbursing
AmTrust for the cost to defend the 2017 Securities Matters."  *Id*., at ¶ 77; Ex. J.
Both allegations are supported by communications directly from AIG and
OneBeacon confirming their respective policies are exhausted.  In evaluating a
motion to dismiss, the Court must accept all well-pled factual allegations in the
complaint as true and draw all reasonable inferences in favor of the plaintiff.  *See*
*Mayer v. Belichick*, 605 F.3d 223, 230 (3d Cir. 2010).

Above all, there is simply no basis under the terms of the Liberty Excess
Policy or at law for Liberty to second-guess the exhaustion of the Underlying
Policies.  The Liberty Excess Policy contains no language requiring the amounts
paid by the underlying carriers to be "covered Loss" or that permit Liberty to select
what amounts to recognize.  The Reduction or Exhaustion clause in the Liberty
Excess Policy states the circumstance in which the Liberty Excess Policy attaches.

That clause states that attachment occurs "[i]n the event of the reduction of the Underlying Limits of Liability by reason of payment of loss, this Policy shall pay excess of the reduced limits."  Amended Complaint, at ¶ 37; Ex. E at § 5.  Notably, the Liberty Excess Policy does not use the capitalized defined term "Loss," but instead refers to the more generalized term "loss," demonstrating the decision to view loss liberally, and not to require the underlying defense costs meet the definition of covered Loss.

Here, it is indisputable that the Underlying Policies have been exhausted by payment of loss, as that uncapitalized term is used in the Liberty Excess Policy. Liberty's argument that AmTrust must further prove such loss meets the definition of covered Loss must be rejected.

The clear weight of authority rejects Liberty's position, prohibiting excess insurers from denying claims by disputing the validity of payments by underlying carriers absent fraud.  *See AXIS Reinsurance Co. v. Northrop Grumman Corp.,* 2020 WL 5509743, at *4 (9th Cir. Sept. 14, 2020) ("clear weight of authority" does not permit an excess insurer to challenge the underlying insurers' payment decisions in the absence of fraud, bad faith or a clear contractual provision providing such a right); *accord, U.S. Fid. & Guar. Co. v. Treadwell Corp.*, 58 F. Supp. 2d 77, 106 (S.D.N.Y. 1999) (same); *Edward E. Gillen Co. v. Ins. Co. of Pa.*, 2011 WL 1694431, at *4 (E.D. Wis. May 3, 2011) ("an excess liability insurer

23

cannot avoid or reduce liability under its own policy by challenging a separate insurer's decision to settle or pay out claims at a prior layer of insurance"); *UNR Indus., Inc. v. Cont'l Ins. Co.*, 1988 WL 121574, at *16 (N.D. Ill. Nov. 9, 1988) (same); *Chartis Specialty Ins. Co. v. Scott Homes Multifamily Inc.,* 2014 WL 12729090, at *4 (D. Ariz. Mar. 31, 2014) (excess insurer cannot "challenge [the primary insurer's] decision to provide coverage."); *ARM Props. Mgmt. Group v. RSUI Indem. Co.*, 2008 WL 5973220, at *5-7 (W.D. Tex. Aug. 25, 2008) (same).

As explained in *Gillen*, "[a]n excess insurer, particularly a 'follow-form' insurer, assumes the risk that the primary insurer will adjust claims in a certain manner and in such a way that triggers liability (and the duty to defend) under the excess policy." 2011 WL 1694431, at *4. Here, after AmTrust completed its own review and approvals, AIG and OneBeacon conducted their own independent investigations and reviews of the defense invoices, including meetings with defense counsel and in-depth reviews of the defense effort. *See* Amended Complaint, ¶¶ 64-68, 72. Thus, there is no factual or legal basis for Liberty's argument that AmTrust has failed to exhaust underlying coverage.

If anything, Liberty's arguments underscore AmTrust's request in its Amended Complaint that this Court enter a declaration that "Liberty cannot dispute the propriety of AIG's and OneBeacon's payment of their respective limits for the defense of the 2017 Securities Matters, cannot dispute the resulting exhaustion of

the AIG Primary Policy and OneBeacon Excess Policy, and consequently the Liberty Excess Policy is triggered." *Id.*, ¶¶ 27-28. Liberty's MTD should therefore be denied.

### A. Delaware Interprets Defense Costs Broadly to Include Dual-Purpose Defense Costs.

In a further attempt to relitigate amounts paid by AIG and OneBeacon, Liberty attempts to rebut an argument AmTrust has never made – that the Commission investigation is a Securities Claim. Nevertheless, Liberty is not permitted to relitigate amounts paid by the underlying carriers under the Liberty Excess Policy or at law. *See supra* at IV. In fact, Liberty concedes the Primary Policy's Allocation Provision dictates the parties will "use their best efforts to determine a fair and proper allocation of amounts as between" AmTrust and Insured Persons. MTD at 23. AIG and OneBeacon did just that in determining what Defense Costs to pay for the 2017 Securities Matters under their respective policies. Liberty cannot now refuse to accept those agreements made between AmTrust and its other carriers, and the subsequent exhaustion of those policies, merely because it would have made a different allocation or adjusted the claim differently.

What is more, Delaware law takes an expansive view of Defense Costs. *See, Legion Partners Asset Mgmt., LLC v. Underwriters at Lloyds London*, 2020 WL 5757341, at *11 n.87 (Del. Super. Sept. 25, 2020) ("all expenses reasonably

25

necessary to conduct the defense are covered, whether or not they have an ancillary benefit to the insured.").   In fact, the Court in *Northrop* explained that dual-purpose defense costs can be covered defense costs where those fees are "reasonably necessary" to minimizing litigation expenses and developing strategies for defending the covered action.   2021 WL 347015, at *12 (defense expenses for pre-litigation investigation could be covered Defense Costs if benefiting defense or strategy of litigation).   Liberty's argument that the "dual-purpose" nature of Defense Costs is "manufactured" runs directly counter to this Delaware authority. *See* MTD at 23.[7]   AmTrust has sufficiently plead the Underlying Policies are exhausted, that AmTrust has triggered the Liberty Excess Policy, and it has incurred Defense Costs and Pre-Claim Inquiry Costs within the Liberty Excess Policy layer.   *See Mayer,* 605 F.3d at 230 (the Court must accept all well-pled factual allegations in the complaint as true).   Liberty's MTD must therefore be denied.

## **CONCLUSION**

For the reasons stated above, AmTrust respectfully requests the Court deny Liberty's MTD.  If this Court finds otherwise, AmTrust respectfully requests leave to amend.

---

[7] Given Delaware law applies to this dispute, *Hertz Glob. Holdings, Inc. v. Nat'l Union Fire Ins. Co. of Pittsburgh*, 2021 WL 1198802, at *3 (S.D.N.Y. Mar. 30, 2021) is inapplicable.  *See* MTD at 22-26.

**BERGER HARRIS LLP**

OF COUNSEL:

Peter M. Gillon (*pro hac vice*)
Charrise L. Alexander (*pro hac vice*)
PILLSBURY WINTHROP SHAW
PITTMAN LLP
1200 Seventeenth Street NW
Washington, D.C. 20036-3006
Tel: (202) 663-9249
peter.gillon@pillsburylaw.com
charrise.alexander@pillsburylaw.com

Dated:  July 20, 2021
Wilmington, Delaware

*/s/ David J. Baldwin*
David J. Baldwin (DE ID No. 1010)
Peter C. McGivney (DE ID No. 5779)
1105 N. Market Street, 11th Floor
Wilmington, DE  19801
Tel.: (302) 655-1140
Fax: (302) 655-1131
dbaldwin@bergerharris.com
pmcgivney@bergerharris.com
*Attorneys for Plaintiff AmTrust Financial
Services, Inc.*