# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

|  |  |  |
|---|---|---|
| AMTRUST FINANCIAL SERVICES, INC., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | C.A. No. 21-374-JLH |
| | ) | |
| LIBERTY INSURANCE | ) | |
| UNDERWRITERS INC., | ) | |
| | ) | |
| Defendant. | ) | |

## <u>MEMORANDUM OPINION</u>

David J. Baldwin, Peter C. McGivney, BERGER MCDERMOTT LLP, Wilmington, Delaware; Tamara D. Bruno, PILLSBURY WINTHROP SHAW PITTMAN LLP, Houston, Texas; Peter M. Gillon, PILLSBURY WINTHROP SHAW PITTMAN LLP, Washington, D.C.

> *Attorneys for Plaintiff*

Robert J. Katzenstein, Julie M. O'Dell, SMITH KATZENSTEIN & JENKIN LLP, Wilmington, Delaware; Ronald P. Schiller, Daniel J. Layden, Marianne E. Bradley, HANGLEY ARONCHICK SEGAL PUDLIN & SCHILLER, Philadelphia, Pennsylvania.

> *Attorneys for Defendant*

Wilmington, Delaware
September 24, 2025

**JENNIFER L. HALL, U.S. DISTRICT JUDGE**

This is an insurance coverage dispute. Plaintiff AmTrust Financial Services, Inc. ("AmTrust") seeks to recover costs it incurred in connection with two shareholder lawsuits filed in 2017. Defendant Liberty Insurance Underwriters Inc. ("Liberty") participated in a tower of coverage effective September 30, 2016, to September 30, 2017. If AmTrust's losses in connection with the 2017 lawsuits are covered by that tower, Liberty is on the hook. But Liberty contends that an earlier tower is the proper source of coverage because the 2017 lawsuits "arise out of" circumstances noticed by AmTrust during the earlier period.

The parties have cross-moved for summary judgment as to whether the 2017 shareholder lawsuits fall under the earlier tower or the later tower. The answer is dispositive of this case. For the reasons explained below, I agree with Liberty.

I.    **BACKGROUND**

A.    **AmTrust and its Insurance Policies**

The relevant facts are largely undisputed. Plaintiff AmTrust is a property and casualty insurance holding company incorporated in Delaware. During the period at issue, AmTrust was a publicly traded company.

AmTrust has a number of Directors and Officers ("D&O") insurance policies from different insurers covering different policy periods. Relevant here, AmTrust has a tower that covers the period of September 30, 2014 to September 30, 2015 (the "2014–2015 Tower"). Non-party Illinois National Insurance Company ("AIG") issued the primary policy in the 2014–2015 Tower (D.I. 26 ("2014 Primary Policy")), and the tower also includes a number of excess policies that "followed form" to the 2014 Primary Policy. The 2014 Primary Policy provides that, "[i]f during the Policy Period . . . an Organization or an Insured Person becomes aware of and notifies the Insurer in writing of circumstances that may give rise to a Claim being made against an Insured

2

. . . then any Claim that is subsequently made against an Insured that arises from such circumstances . . . shall be deemed to have been first made at the time of the notification of circumstances for the purpose of establishing whether such subsequent Claim was first made during the Policy Period . . . ."  (D.I. 27, Ex. C § 7(c).)

AmTrust has another tower that covers the period of September 30, 2016, to September 30, 2017 (the "2016–2017 Tower").  The primary policy in the 2016–2017 Tower was also issued by AIG.  (D.I. 133, Ex. 1 ("2016 Primary Policy").)    That represents AmTrust's first "layer" of coverage in the 2016–2017 Tower.  There is also a line of excess policies.  Defendant Liberty issued a second-level excess policy, which provided the third layer of coverage (the "2016 Liberty Policy" or the "2016 Policy").  (D.I. 133, Ex. 3.)  Like the other excess policies in the 2016–2017 Tower, the 2016 Liberty Policy "follows form," meaning that it "incorporates by reference . . . the Primary Policy . . . except as otherwise provided herein."  (*Id.* § 1.)

The Primary Policy—and therefore the Liberty Policy—covers "Loss" with respect to "Claims first made . . . during the Policy Period . . . and reported to the insurer as required by this policy."  (D.I. 133, Ex. 1 § 1.)  But it excludes coverage for "Claims . . . arising out of any circumstances of which notice has been given under any directors and officers liability insurance policy in force prior to the inception date of this policy."  (*Id.* § 7(b) ("Prior Notice Exclusion").)  As explained in more detail below, the main dispute in this case is whether AmTrust's losses from two shareholder lawsuits filed in 2017 are covered by the 2016–2017 Tower or whether the shareholder lawsuits fall under the Prior Notice Exclusion because they "ar[ose] out of . . . circumstances of which notice" was previously given under a D&O policy in the 2014–2015 Tower.

### B.    AmTrust's Accounting is Questioned

In 2013, Casey Nelson, the President of an investment firm called Alistair Capital Management, saw anomalies in AmTrust's financial statements and accounting.  Nelson first noticed an anomaly with respect to AmTrust's life settlement contracts—it appeared to Nelson that AmTrust was purchasing life settlement contracts and then immediately marking them up to three times the purchase amount.  (D.I. 133, Ex. 33 at 46–47.)  That and other concerns about AmTrust's accounting caused Nelson to believe that AmTrust stock might fall, so Nelson's firm Alistair Capital Management took a short position in AmTrust, betting that the price of AmTrust stock would decline.  (*Id.* at 23–24.)

Around the same time, others in the financial industry observed potential discrepancies in AmTrust's accounting.  Between 2013 and early 2015, the financial press published a number of articles and reports that questioned AmTrust's accounting.  In a report to its audit committee in 2015, AmTrust referred to 31 such reports as the "Short Reports."  (D.I. 121, Ex. A at 2–4.)  For example, in April 2013 the equity research firm Off Wall Street published a report questioning certain inconsistencies in AmTrust's financial statements.  (*Id.* at 2, 5–6.)  And, in early 2014, two articles were published in the influential financial magazine *Barron's* that questioned whether AmTrust's accounting for reserves, deferred acquisition costs, and intercompany transactions was accurate.  (D.I. 162, Ex. 1 (February 8, 2014 *Barron's* article), Ex. 2 (May 31, 2014 *Barron's* article).)

The government also began investigating the allegations against AmTrust.  In late May 2013, the SEC sent AmTrust a subpoena seeking documents related to AmTrust's accounting for life settlements as well as drafts of AmTrust's SEC filings.  (D.I. 121, Ex. B.)  AmTrust produced thousands of responsive documents and made a presentation to the SEC regarding the company's life settlement portfolio.  (D.I. 121, Ex. A at 6.)

In November 2013, Nelson contacted Christopher Ahart, an SEC attorney, to share his concerns regarding AmTrust. Nelson began sending Ahart a series of memoranda detailing his concerns, and at least twice traveled to SEC offices to make presentations and share information regarding AmTrust. (D.I. 121, Ex. D at 63–65, Ex. C, Ex. F, Ex. G, Ex. H, Ex. I, Ex. J.) The memos and presentations raised a number of specific concerns regarding, among other things, under-reserving and improperly ceding losses to AmTrust's Luxemburg captive insurance subsidiaries, discrepancies between AmTrust's filings (including with respect to intercompany transactions), overcapitalization of deferred acquisition costs and accrued expenses, overvaluation of life settlement contracts, and flawed acquisition accounting.

In January 2014, after another article was published questioning AmTrust's accounting along similar lines, the SEC sent AmTrust another subpoena, this time asking specific questions and requesting documents related to AmTrust's transactions with its subsidiaries, its deferred acquisition costs, and the discrepancies in its filings—the same issues raised in Nelson's memos and the Short Reports. (D.I. 121, Ex. A at 6, Ex. E.) AmTrust made another presentation to the SEC, this time regarding its reinsurance subsidiaries, and the SEC made a number of follow-up requests. (D.I. 121, Ex. A at 6.) On January 9, 2015, the SEC confirmed to AmTrust that its investigation remained ongoing and sought additional memos and workpapers created by AmTrust's internal auditors. (*Id.*)

AmTrust's executives were concerned that the company was being unfairly maligned in the press and by investigators. (*Id.* at 1.) So AmTrust started to take matters into its own hands. In addition to releasing press statements pushing back on the allegations, AmTrust also filed a lawsuit in New York state court against Nelson and certain Short Report authors on December 14, 2014. (*Id.*; D.I. 133, Ex. 32 at 17–19.) That suit was voluntarily dismissed.

5

C.      **The Alistair Letter and the 2015 Notice of Circumstance**

On December 18, 2014, Nelson published a 19-page letter addressed to AmTrust's Audit Committee.  (D.I. 133, Ex. 32 (the "Alistair Letter" or "Letter").)   The Letter alleged that AmTrust's financial statements contained numerous discrepancies suggesting that the financial statements were likely materially misstated.  It discussed the following issues:

(1) <u>Material weaknesses in internal controls over financial reporting.</u>  The Letter raised four concerns regarding material weaknesses in internal controls over financial reporting:

> (a) First, the Letter described "frequent and material differences between amounts reported in AmTrust's Forms 8-K, filed with the SEC in conjunction with quarterly earnings reports, and amounts reported to the SEC in the Company's Forms 10-K and 10-Q." (*Id.* at 2.) It specifically identified Loss & LAE Reserves and Unearned Premiums as line items that could not be reconciled based on AmTrust's disclosures. (*Id.* at 4.)

> (b) Second, the Letter noted that "AmTrust's 'Analysis of Loss and Loss Adjustment Expense Reserve Development' implies that the remaining reserves for accident years 2008 and 2009 are *negative*, which is an 'accounting impossibility.'" (*Id.*) It asserted that this result was "indicative of poor internal controls for financial reporting, significant under-reserving, or bad data," and was "highly concerning" because AmTrust's "actuaries rely upon the data" to make important estimates. (*Id.* at 5.)

> (c) Third, the Letter identifies irreconcilable amounts reported for "Accrued Expenses & Other Liabilities." (*Id.*) It pointed out discrepancies in AmTrust's Accrued Expenses & Other Liabilities balance compared to AmTrust's cash flow statement and purchase price allocation disclosures (including the 2010 acquisition of the

6

Warrantech business).  (*Id.*)  The Letter noted that the discrepancies "could imply that AmTrust is failing to recognize expenses, and thus overstating net income, when the Company makes cash payments for which it did not already have a reserve—another 'accounting impossibility.'"  (*Id.*)

(d) Fourth, the Letter explained that AmTrust's CFO Ronald Pipoly had served as CFO of a related entity, Maiden Holdings, at the time that Maiden "had a series of deficiencies which aggregated to a material weakness in internal control over financial reporting when Pipoly served as its CFO."  (*Id.* at 6.)

(2) <u>Accounting for deferred acquisition costs.</u>  Citing the *Barron's* article, the Letter asserted that "AmTrust appears to understate its expense ratio, and therefore overstate its net income, as a result of a mismatch in the Company's recognition of acquisition costs and premiums in a way that may violate U.S. GAAP."  (*Id.* at 7.)  Nelson's comparison of AmTrust's DAC Ratio to the company's net expense ratio suggested that AmTrust's "accounting for acquisition costs may be violating the 'matching principle,'" that is, that acquisition costs are to be recognized proportionate to a company's recognition of deferred revenue.  (*Id.* at 7–8.)  "Instead, AmTrust appears to amortize DAC much more slowly than it recognizes the corresponding premium revenue."  (*Id.* at 9.)  And the Letter alleged that AmTrust's public statements on this issue were "misleading" and "inadequate."  (*Id.* at 7–8.)

(3) <u>Valuation of life settlement contracts.</u>  The Letter next asserted that AmTrust's accounting for life settlement contracts violates accounting standards "by ignoring readily available information about the inputs market participants use to value life-settlement contracts."  (*Id.* at 9.)  It alleged that AmTrust's life settlement contracts were overvalued because the company

was not using "market-based assumptions" but using improperly low discount rates resulting in inflated valuations. (*Id.* at 10.)

(4) <u>Reinsurance assets related to Maiden Holdings, Ltd.</u>  The Letter further discussed "sizeable differences between balance sheet accounts reported in AmTrust's financial statements and the amounts Maiden [a related party] reports for the corresponding accounts in its financial statements." (*Id.* at 11.)  Based on Nelson's analysis, the Letter identified an approximately $240 million difference in Loss & LAE Reserves ceded to Maiden. (*Id.* at 12.)  The Letter again quoted AmTrust's public discussion of this issue, contending that AmTrust's statement was misleading because it "implies that the amount AmTrust estimates it will recover from Maiden for [claims incurred but not reported] is twice what Maiden estimates it will pay AmTrust for [claims incurred but not reported]." (*Id.*)  The Letter concluded that AmTrust was either (a) over-stating the amount AmTrust would recover from Maiden, thereby over-stating AmTrust's equity and violating accounting standards requiring that reinsurance receivables are recognized consistently with gross reserves, or (b) under-stating the amount Maiden would have to pay AmTrust, suggesting "substantial counterparty risk that could result in an incapacitated reinsurance partner and reduced recoveries." (*Id.* at 12–13.)

(5) <u>Consolidation of Luxembourg reinsurance captives.</u>  The Letter next addressed a similar issue with respect to AmTrust's accounting for Luxembourg Reinsurance Captives ("LRCs").  It alleged that

> Despite numerous questions about and criticisms of AmTrust's accounting for LRCs, the Company has not provided a viable explanation that reconciles the Net Loss and Loss Adjustment Expenses of its subsidiaries with the Net Loss and Loss Adjustment Expenses the Company reports in its SEC filings.  The difference appears to be related to Loss and Loss Adjustment Expenses assumed by LRCs, which seem to be *excluded* from AmTrust's reported results in SEC filings, even though the SEC filings seem to

*include* the benefit AmTrust International Insurance, Ltd. ("AII") receives.

(*Id.* at 13.)  The Letter quoted AmTrust's shifting public statements on this issue, suggesting that the statements were "troubling" and in conflict with accounting standards.  It concluded that "conflicting disclosures such as these indicate AmTrust's financial statements are not reliable" and suggested that "the problem relates either to a failure to fully eliminate intercompany items . . . or a failure to recast the financials of its subsidiaries in accordance with U.S. GAAP before consolidating them."  (*Id.* at 14.)

(6) <u>Accounting for Loss & LAE Reserves assumed in acquisitions.</u>  Finally, the Letter identified a material discrepancy between AmTrust's disclosure of Loss and LAE Reserves in its Balance Sheet and Cash Flow statement and the amount disclosed in its reserve reconciliation disclosure.  (*Id.* at 15.)  The Letter stated that the discrepancy "raises troubling questions about whether ASC 944-805 was applied correctly throughout the financial statements," and suggests that AmTrust's expenses were understated (resulting in an overstatement of income).  (*Id.*)

On January 8, 2015, AmTrust reported to its insurers a "Notice of Circumstance" regarding the Alistair Letter.  (*See* D.I. 133, Ex. 38 (the "2015 Notice").)  Under "Description of Occurrence," the 2015 Notice states, "ALISTAIR CAPITAL / ALLEGES ACCOUNTING IRREGULARITIES VIA LETTER TO AMTRUST FINANCIAL AUDIT COMMITTEE."  (*Id.*) And under "Remarks," the 2015 Notice states "SEE ATTACHED LETTER SENT TO AMTRUST'S AUDIT COMMITTEE."[1]  (*Id.*)

---

[1] The copy of the 2015 Notice provided to the Court in the summary judgment record does not contain any attachments, but the parties discuss the 2015 Notice as if the Alistair Letter was attached to and disclosed with the 2015 Notice.

### D.    Interregnum

On January 29, 2015, AmTrust's general counsel Stephen Ungar addressed the allegations made in the Alistair Letter, the Short Reports, and the SEC's subpoenas in a "Report to Audit Committee on Allegations Made by Alistair Capital." (D.I. 133, Ex. A.) The report said that "the Company believes that the Nelson Letter has no basis in fact." (*Id.* at 1.) Still, the report asserted AmTrust management's view that the Alistair Letter "raises precisely the same issues that have been reiterated repeatedly in the Short Reports." (*Id.* at 6.) After reviewing the report and discussing the issues with AmTrust's external auditor, BDO, AmTrust's Audit Committee declined to take any further action regarding the Alistair Letter. (D.I. 122, Ex. N at 74.)

While public interest in AmTrust's accounting began to wane, the SEC investigation continued, albeit slowly. Sometime in 2015, Nelson closed Alistair Capital's short position in AmTrust stock at a loss. (D.I. 133, Ex. 33 at 24–25.) Yet Nelson continued communicating with and providing information to the SEC, including in a 135-page report Nelson sent to the SEC on December 26, 2016. (D.I. 122, Ex. K.)

Meanwhile, the New York Department of Financial Services ("NYDFS") was also investigating AmTrust in connection with AmTrust's acquisition of another insurance company. Nelson was in contact with the NYDFS, and the NYDFS' investigation was prompted by the Short Reports and Nelson's allegations. (D.I. 121, Ex. A at 6 (AmTrust's General Counsel Stephen Unger stating, in a report to AmTrust's Audit Committee, that the NYDFS investigation "was undertaken in response to Nelson's presentation to the NYDFS, in which it appears Nelson made allegations which were identical to the allegations in the Short Reports").) The NYDFS "conducted three targeted examinations of the Company for the expressed purpose of investigating the allegations in the Short Reports." (*Id.* at 5.) Although the NYDFS ultimately approved the

acquisition transaction, it required AmTrust to "upgrade accounting firms."[2]  (D.I. 158, Ex. L at 205.)  AmTrust dismissed its external auditor BDO and engaged KPMG as AmTrust's external auditor for the year ending December 31, 2016.  (D.I. 133, Ex. 5 at F-2, F-3.)

### E.    The Restatement

On February 27, 2017, AmTrust announced that "the completion of its financial statements for the fiscal year ended December 31, 2016 and of the related audit will require additional time beyond the March 1, 2017 due date" imposed by the SEC to file AmTrust's Annual Report on Form 10-K for the 2016 fiscal year.  *See* AmTrust Financial Services, Inc., Current Report (Form 8-K) (February 27, 2017).[3]  AmTrust stated that it would seek a brief extension of the deadline to file its 2016 10-K.  (*Id.*)

On March 14, 2017, AmTrust announced that

> in connection with the preparation and audit of the financial statements to be included in the 2016 Form 10-K, the Audit Committee of the Board of Directors of the Company, in consultation with management, concluded that the Company's previously issued consolidated financial statements for 2014 and 2015 (including for each of the four quarters of 2015) as well as for the first three quarters of 2016 should be restated and should no longer be relied upon because of certain accounting errors contained in such financial statements. . . . Additionally, the reports of BDO USA, LLP ("BDO") on the Company's consolidated financial statements for 2014 and 2015, including its opinion on the effectiveness of internal controls over financial reporting for such periods, likewise should no longer be relied upon.  The Company

---

[2] In a Form 8-K filed with the SEC on September 16, 2014, AmTrust disclosed that the NYDFS approved the transaction but required that "[i]n light of AmTrust's growth and increased geographic footprint, AmTrust will engage an external auditing firm with corresponding global resources and skills[,]" and that "the selection of the auditing firm shall be subject to the review and approval of the Department."  *See* AmTrust Financial Services, Inc., Current Report (Form 8-K) (September 16, 2014); *In re NAHC, Inc. Sec. Litig.*, 306 F.3d 1314, 1331 (3d Cir. 2002) (court may take judicial notice of documents filed with the SEC).

[3] Although both parties repeatedly discuss the February 27, 2017 statement (D.I. 130 at 5; D.I. 133 ¶¶ 15, 19; D.I. 155 ¶ 15), the parties did not provide it to the Court with the summary judgment materials.  The Court takes judicial notice of AmTrust's February 27, 2017 SEC filing.

will include certain restated financial statements and financial information with respect to all affected periods in its 2016 Form 10-K to be filed with the SEC.

. . .

The Company is restating its financial statements and related disclosures primarily to correct two errors reported in its historical consolidated financial statements. These errors relate to: (1) upfront recognition of a portion of warranty contract revenue associated with administration services, based on the interpretation of ASC 605, *Revenue Recognition*, used in the previously filed financial statements related to multiple-element revenue recognition, instead of deferred recognition of the revenue over the life of the contract; and (2) bonuses that were not expensed in the year paid but that should have been accrued in the year earned based on ASC 710, *Compensation*, and ASC 270, *Interim Reporting*. . . . The Company will also make other miscellaneous adjustments that had been previously identified but not corrected because they were not material, individually or in the aggregate, to its previously issued consolidated financial statements. In addition, the Company expects to have certain other non-cash corrections related to deferred acquisition costs and the capitalization of software development costs in 2016.

(D.I. 133, Ex. 4.)

On April 3, 2017, AmTrust filed its restated financial statements in its 2016 Form 10-K for the fiscal year ending December 31, 2016. (D.I. 133, Ex. 5 ("Restatement").) The Restatement reiterated that the corrections were "primarily" due to the same two issues identified in the March 14, 2017 announcement, but that the Company had "also identified other adjustments . . . that have been corrected as part of this Restatement." (*Id.* at F-23.) In all, the Restatement identified nine issues requiring adjustments to correct errors: (1) "Warranty Fee Revenue," (2) "Accrual of Bonuses," (3) "Deferred Acquisition Costs," (4) "Foreign exchange gain/(loss)," (5) "Capitalized software," (6) "Imputed interest," (7) "Intercompany eliminations," (8) "Other Items," and (9) "Balance Sheet Items." (*Id.* at F-23–24.)

The Restatement also disclosed that AmTrust's "internal control over financial reporting was not effective as of December 31, 2016, due to the identification of two material weaknesses in internal control over financial reporting." (*Id.* at 89.) The first material weakness in internal control over financial reporting was "[i]neffective assessment of the risks of material misstatement in financial reporting." (*Id.* at 90.) "Specifically, management did not appropriately assess the risks associated with the financial reporting of foreign exchange, deferred acquisition costs, goodwill impairment, warranty administration services revenue, capitalized costs, period-end expense accruals and the statements of cash flows and other comprehensive income." (*Id.*) The second material weakness was "[i]nsufficient resources in the Corporate Accounting and Corporate Financial Reporting Groups." (*Id.*) The Restatement explained that AmTrust was

> not able to effectively design and execute our process level internal controls around the consolidation process and preparation of financial statements, specifically subsidiary close and consolidation adjustments, segregation of duties related to the creation and posting of a discrete number of journal entries, foreign exchange, deferred acquisition costs, goodwill impairment, warranty administration services revenue, capitalized costs, period-end expense accruals and the statements of cash flows and other comprehensive income, and associated disclosures.

> These material weaknesses contributed to material misstatements related to warranty services revenue and accrual of bonuses that were corrected prior to the issuance of the financial statements. Additionally, these material weaknesses contributed to other misstatements to foreign exchange adjustments, deferred acquisition costs, and period-end accruals.

(*Id.*)

The Restatement also restated AmTrust's reconciliation of the beginning and ending balances for loss and loss adjustment expense reserves ("Loss and LAE Reserves") for 2014 and 2015. (*Id.* at F-68.)

The following week, the *Wall Street Journal* published an article reporting that the SEC, the NYDFS, and the FBI were each conducting investigations into AmTrust's accounting practices as well as its former auditor, BDO.[4]

### F.     The 2017 Securities and Derivative Lawsuits

#### 1.     The Securities Lawsuit

On February 28, 2017, the day after AmTrust announced that its 2016 10-K would be delayed, an AmTrust stockholder filed a class action complaint under Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 and Rule 10b-5, alleging that AmTrust and its officers made materially false and/or misleading statements regarding the effectiveness of AmTrust's internal controls over financial reporting and its financial results as reported in its financial statements. (D.I. 133, Ex. 6 (original complaint).)  That lawsuit and others were consolidated into a case captioned *In re AmTrust Financial Services, Inc. Securities Litigation*, C.A. No. 1-17-cv-01545, in the U.S. District Court for the Southern District of New York.  (D.I. 133, Ex. 7 (the "Securities Lawsuit").)

The operative complaint in the Securities Lawsuit alleges that AmTrust's officers knowingly or recklessly issued materially false and/or misleading financial statements and other representations.  (*Id.*)  The Securities Lawsuit expressly links its claims to the Restatement—it alleges that AmTrust "has admitted that its financial statements since 2012 were materially misstated in numerous respects and require restatement," and that "[t]hese misstatements are the basis for [Plaintiffs'] claims under the Securities Act."  (*Id.* ¶ 2.)

---

[4] The parties did not provide the Court with a copy of the April 11, 2017 *Wall Street Journal* article in the summary judgment record.  The complaints in the 2017 shareholder lawsuits both cite to the article.  (D.I. 133, Ex. 7 ¶ 528; Ex. 11 ¶ 18.)  The Court takes judicial notice of the article's existence.  *Selkridge v. United of Omaha Life Ins. Co.*, 360 F.3d 155, 162 n.5 (3d Cir. 2004) (noting that a court may take judicial notice of the existence of a published article); *Ieradi v. Mylan Labs., Inc.*, 230 F.3d 594, 598 n.2 (3d Cir. 2000) (same).

It alleges that AmTrust's financial statements were materially misstated and not in accordance with applicable accounting standards.  (*Id.*)  Specifically, it alleges that AmTrust's financial statements were materially false and/or misleading with respect to, among other things, AmTrust's warranty revenue (*id.* ¶¶ 119–28), accrued compensation expense (*id.* ¶¶ 129–38), deferred acquisition costs (*id.* ¶¶ 139–43), and intercompany transactions (*id.* ¶¶ 152–53).  It alleges that, as a result of these errors, AmTrust's reported income from 2011 to 2016 was materially overstated.  (*Id.* ¶¶ 157–58.)  In alleging that AmTrust executives knew that its accounting methods were improper, it specifically cites the Alistair Letter, the Short Reports, and the SEC and NYDFS investigations. (*Id.* ¶¶ 305–47.)  And it alleges that AmTrust stock declined precipitously once AmTrust disclosed the errors.  (*Id.* ¶¶ 15, 165.)  The Securities Lawsuit plaintiffs sought damages for purported losses caused by drops in AmTrust's stock price after AmTrust announced it would be filing the Restatement, or alternatively for rescission of their AmTrust stock transactions.  (*Id.* ¶¶ 15, 278, 285–86, 295, 570–74, 582–84.)

After the District Court initially dismissed the Securities Lawsuit, the United States Court of Appeals for the Second Circuit reversed that decision in part and revived certain claims against AmTrust.  (D.I. 133, Ex. 9, Ex. 10.)  Those claims remain pending.

### 2.    The Derivative Lawsuit

AmTrust and its directors and officers were also sued in several derivative lawsuits in 2017. Those lawsuits were consolidated into a case captioned *In re AmTrust Financial Services, Inc. Derivative Litigation*, C.A. No. 1:17-cv-553 in the U.S. District Court for the District of Delaware. (D.I. 133, Ex. 11 (the "Derivative Lawsuit").)

Like the Securities Lawsuit, the Derivative Lawsuit alleged that AmTrust's financial statements were materially false and/or misleading due to the same specific accounting improprieties.  (*Id.*)  The Derivative Lawsuit directly relies on the Alistair Letter's allegations and

cites it repeatedly throughout the complaint.  (*Id.* ¶¶ 10–11, 71–79, 83–84, 86–88, 99–100, 258, 304–05, 315.)  It expressly alleges that AmTrust's financial statements were materially false and misleading for the reasons identified in the Alistair Letter and uses the Alistair Letter's allegations as evidence that AmTrust executives knew that the financial statements were inaccurate.  (*Id.* ¶¶ 84 (alleging that the Alistair Letter "concerned the very same fraudulent and improper accounting practices that later led AmTrust to restate its financials and that subjected them to securities fraud lawsuits and investigations by government agencies"), 87 ("Thus, the Alistair Capital Letter put Defendants on notice of the overarching and severe problems with the Company's internal controls and its related impact on the Company's financial reporting."), 304 (citing the Alistair Letter and alleging that AmTrust's Board of Directors was "on notice since no later than December 2014 that AmTrust's financial statements were not reliable").)  The Derivative Lawsuit plaintiffs sought recovery of alleged damages to AmTrust itself, including restitution from its management and other equitable remedies.  (*Id.* ¶¶ 341, 348, 352, 357, 366, 374, 383–84, 388.)

The Derivative Lawsuit was voluntarily dismissed on February 14, 2019.  (D.I. 133, Ex. 12.)

### G.    The SEC Investigation Continues

Meanwhile, the Restatement also provided additional fodder for the SEC Investigation.  On April 28, 2017, the SEC sent a third subpoena to AmTrust (with the same Matter Under Investigation number as the prior subpoenas), seeking information regarding AmTrust's (1) accounting for LRCs, (2) intercompany reinsurance agreements, (3) communications with Bermuda and Luxembourg regulators concerning AmTrust's intercompany reinsurance transactions with Luxembourg-based entities, and (4) estimate of loss reserves and related loss adjustment expenses.  (D.I. 122, Ex. L.)  And, on November 14, 2017, the SEC issued a fourth subpoena to AmTrust (with the same Matter Under Investigation number), this time inquiring into,

among other things, AmTrust's whistleblower policies and AmTrust's communications with certain third-parties including Alistair Capital, Casey Nelson, and "any Person who has allegedly or purportedly published an article about AmTrust, or is referenced in any article about AmTrust, in Seeking Alpha, Barron's, or the Wall Street Journal."  (D.I. 122, Ex. M at 1, 5–7.)

AmTrust retained the same counsel to represent it in the 2017 Securities and Derivative Lawsuits and to investigate and respond to the SEC subpoenas.  (D.I. 133, Ex. 34 at 92; Ex. 36 at 49–50.)  From June 7, 2018 to June 4, 2019, six of AmTrust's executives and employees were interviewed on the record by the SEC in connection with its investigation of AmTrust.  (D.I. 133, Ex. 16, Ex. 17, Ex. 18, Ex. 19, Ex. 20, Ex. 21.)

The SEC investigation culminated in an enforcement action filed against AmTrust and its former CFO Ronald Pipoly on June 17, 2020.  (D.I. 133, Ex. 22.)  The SEC complaint alleged that AmTrust and Pipoly failed to disclose (i) AmTrust's methodologies for determining management's best estimate of loss reserves ("MBE"), (ii) that AmTrust's process to determine MBE "diverged from the actuarial analyses of AmTrust's internal and external actuaries," and (iii) that AmTrust's "process included consolidated accounting adjustments that diverged from internal actuarial estimates to report MBE in the Company's consolidated financial statements ('MBE Adjustments'), including the total and segmental amounts of MBE Adjustments, their impact on AmTrust's reported loss reserves and expenses, and the specific factors or assumptions supporting management's judgment to record the MBE Adjustments."  (*Id* ¶ 2.)  And it specifically discussed AmTrust's MBE Adjustments with respect to  LRCs:

> In certain reinsurance transactions, AmTrust's wholly owned reinsurance subsidiary in Bermuda, AmTrust International Insurance, Ltd. ('AII-Bermuda'), ceded losses to AmTrust's wholly owned reinsurers in Luxembourg, commonly known as the Luxembourg Reinsurance Captives ('LRCs').  AII-Bermuda's ceded losses were fully assumed by the LRCs in these transactions

> so the ceded and assumed losses matched in the subsidiaries'
> accounting records (the 'Luxembourg Transactions'). During
> AmTrust's consolidation process, however, Pipoly recorded MBE
> Adjustments by changing the LRCs' assumed losses so that
> AmTrust's consolidated accounting records reflected MBE for
> financial reporting purposes (the 'Luxembourg Method').

(*Id.* ¶ 25.)  The SEC enforcement action was resolved by consent judgment.  (D.I. 133 ¶ 41; D.I. 155 ¶ 42.)  The SEC subsequently issued a whistleblower award to Nelson for his assistance in the investigation.  (D.I. 157, Ex. D at 100–01.)

### H.    Insurance Coverage Decisions

AmTrust provided notice of the Securities Lawsuit to its insurers on March 3, 2017 (D.I. 133, Ex. 23), and of the Derivative Lawsuit on April 21, 2017 (D.I. 133, Ex. 24).  On May 10, 2017, AIG acknowledged that the Securities Lawsuit and Derivative Lawsuit are covered Claims under the AIG Primary Policy.  (D.I. 133, Ex. 25.)  For its part, Liberty acknowledged receipt of the notices and reserved the right to assert defenses to coverage.  (D.I. 133, Ex. 26.)

By July 2019, AIG and the first-level excess insurer indicated that they had paid the full limit of their liabilities to AmTrust in reimbursement for defense costs.  On April 10, 2019, Liberty informed AmTrust that it had "significant concerns that the Noticed Matters all relate back to a policy period for which Liberty was not on risk," and specifically pointed to the Alistair Letter.  (D.I. 133, Ex. 31 at 4–5.)  Liberty confirmed its denial on September 27, 2019.  (D.I. 133, Ex. 15.)

### I.    Procedural History

AmTrust filed this action on March 15, 2021.  (D.I. 1.)  The operative First Amended Complaint alleges breach of contract (Count I) and seeks a declaratory judgment regarding Liberty's refusal to acknowledge coverage (Counts II–IV).  (D.I. 19.)  Liberty's Answer asserts many defenses, including that "Plaintiff's claims against Liberty are barred to the extent that the Securities Litigation, Derivative Litigation, and SEC Investigation arise out of circumstances

noticed during a policy year in force prior to the September 30, 2016 inception of the AIG Primary Policy, to which the Liberty Excess Policy follows form."  (D.I. 46, Third Affirmative Defense).

The Court denied Liberty's motion to dismiss the First Amended Complaint for failure to state a claim (D.I. 42, 43), and the parties proceeded to discovery.  The parties have now filed cross-motions seeking summary judgment in their favor.  (D.I. 120, 128.)

## II.    LEGAL STANDARDS

A party may move for summary judgment under Federal Rule of Civil Procedure 56. Summary judgment must be granted where "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  The burden is on the movant to demonstrate the absence of a genuine issue of material fact.  *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 585–86 (1986).

"An assertion that a fact cannot be—or, alternatively, is—genuinely disputed must be supported either by 'citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials,' or by 'showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact.'" *Resop v. Deallie*, No. 15-626-LPS, 2017 WL 3586863, at *1 (D. Del. Aug. 18, 2017) (quoting Fed. R. Civ. P. 56(c)(1)(A) & (B)).  A factual dispute is only genuine if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party."  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  The Court must "draw all reasonable inferences in favor of the nonmoving party, and it may not make credibility determinations or weigh the evidence."  *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 150 (2000).

To withstand a motion for summary judgment, a plaintiff "must point to concrete evidence in the record that supports each and every essential element of his case." *Nitkin v. Main Line Health*, 67 F.4th 565, 571 (3d Cir. 2023) (quoting *Orsatti v. N.J. State Police*, 71 F.3d 480, 484 (3d Cir. 1995)); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23 (1986) ("[A] complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial."). "[W]here a non-moving party fails sufficiently to establish the existence of an essential element of its case on which it bears the burden of proof at trial, there is not a genuine dispute with respect to a material fact and thus the moving party is entitled to judgment as a matter of law." *Blunt v. Lower Merion Sch. Dist.*, 767 F.3d 247, 265 (3d Cir. 2014) (citing *Lauren W. v. DeFlaminis*, 480 F.3d 259, 266 (3d Cir. 2007)).

## III.    DISCUSSION

Both sides agree that the Court can and should grant summary judgment on this record.[5] But they disagree about who should win. AmTrust contends that its losses in connection with the 2017 Securities and Derivative Lawsuits are covered under the 2016–2017 Tower. Liberty contends that the 2016–2017 Tower is not the proper source of coverage because the 2017 Securities and Derivative Lawsuits "arise out of" the circumstances disclosed in the 2015 Notice and are therefore subject to the Prior Notice Exclusion.[6]

---

[5] AmTrust's briefs do not argue that the materials cited by the parties establish a genuine dispute of material fact that precludes summary judgment. The parties' separate responsive statements of fact do not dispute the underlying facts of what happened but only the legal implications of those facts. (D.I. 155, 162, 181.)

[6] Under Delaware law, the insured first bears the burden to show that the costs at issue are covered under the policy, and then the insurer bears the burden to show that the costs are excluded under the policy. *RSUI Indem. Co. v. Murdock*, 248 A.3d 887, 906 (Del. 2021). The parties focus on the second step—whether the costs are excluded—and the Court's ruling on that issue resolves the parties' dispute. Accordingly, the Court will assume without deciding that AmTrust's costs

Under Delaware law,[7] whether a claim relates back to an earlier claim or notice of circumstance "is decided by the language of the policy." *First Solar, Inc. v. Nat'l Union Fire Ins. Co. of Pittsburgh, PA*, 274 A.3d 1006, 1013 (Del. 2022). "If the contract language is 'clear and unambiguous, the parties' intent is ascertained by giving the language its ordinary and usual meaning.'" *RSUI Indem. Co. v. Murdock*, 248 A.3d 887, 905 (Del. 2021) (quoting *AT&T Corp. v. Faraday Capital Ltd.*, 918 A.2d 1104, 1108 (Del. 2007)). Here, the Policy language provides that Claims are not covered if they "aris[e] out of any circumstances of which notice has been given" under any prior policy. The parties do not dispute that this language is unambiguous. *See In re Alexion Pharms., Inc. Ins. Appeals*, 339 A.3d 694, 702 (Del. 2025) (provision in insurance policy that excluded coverage for claims "arising out of" wrongful acts disclosed in a prior notice was unambiguous).

The parties do not dispute—and it is established under Delaware law—that "the term 'arising out of' is broadly construed to require some meaningful linkage between the two conditions imposed in the contract." *Pacific Ins. Co. v. Liberty Mut. Ins. Co.*, 956 A.2d 1246, 1257 (Del. 2008); *see also, e.g.*, *Alexion*, 339 A.3d at 703 (similar). Although the phrase "arising out

---

are covered under the Liberty policy because, even if they are, as explained in detail below, they are excluded from coverage under the Prior Notice Exclusion.

[7] As a federal court sitting in diversity, the Court must apply the choice of law rules of the forum state, here, Delaware. *Chin v. Chrysler LLC*, 538 F.3d 272, 278 (3d Cir. 2008) (citing *Klaxon Co. v. Stentor Elec. Mfg. Co.*, 313 U.S. 487, 496 (1941)). Under Delaware law, the Court need only conduct a choice of law analysis where there is an actual conflict of law. *Deuley v. DynCorp. Int'l, Inc.*, 8 A.3d 1156, 1161 (Del. 2010) (quoting *Berg Chilling Sys. Inc. v. Hull Corp.*, 435 F.3d 455, 462 (3d Cir. 2006)). The Court previously observed that Delaware and New York law did not appear to be in conflict. *AmTrust Fin. Servs., Inc. v. Liberty Ins. Underwriters Inc.*, No. 21-374, 2022 WL 980299, at *5 n.3 (D. Del. Mar. 31, 2022). At summary judgment, the parties do not dispute that conclusion, nor do they identify any actual conflict between Delaware and New York law. (D.I. 161 (AmTrust's Answering Br.) at 5–6; D.I. 186, (Liberty's Corrected Opening Br.) at 8.) Accordingly, the Court applies Delaware law.

of" is "paradigmatically broad" and interpreted broadly, any linkage must be "meaningful and not tangential." *Alexion*, 339 A.3d at 703. But "absolute identity is not required." *First Solar*, 274 A.3d at 1016.

In evaluating whether there is a meaningful linkage between an earlier notice and a later claim, the primary factor is whether they "involve the same conduct." *Alexion*, 339 A.3d at 704; *Nat'l Amusements, Inc. v. Endurance Am. Specialty Ins. Co.*, No. N22C-06-018, 2025 WL 720455, at *8 (Del. Super. Ct. Feb. 17, 2025). Other potentially relevant factors include (1) the identity of the parties, (2) the relevant time period, (3) the overall theory of liability, (4) a sampling of relevant evidence, and (5) the claimed damages. *Immunomedics, Inc. v. Hudson Ins. Co.*, No. N23C-08-179, 2024 WL 1235407, at *12 (Del. Super. Ct. Mar. 18, 2024) (citing *First Solar*, 274 A.3d at 1014). Although these other factors may be relevant in some cases, "[i]t is the common underlying wrongful acts that control." *Alexion*, 339 A.3d at 704.

The Delaware Supreme Court's recent decision in *Alexion* is instructive. There, the court considered a similar issue—whether a securities lawsuit "arose out of" the same alleged wrongful acts disclosed in an earlier notice of circumstance. In 2015, the insured submitted a notice of circumstance to its insurers disclosing an SEC investigation of the insured. The SEC was investigating the insured's worldwide grant-making policies (in particular, in Japan, Brazil, Russia, and Turkey), as well as the company's disclosures regarding a particular drug. In late 2016, a securities lawsuit was filed against the company, alleging that its disclosures regarding its sales and lobbying practices were materially false and misleading. The insured sought coverage for the 2016 lawsuits under its 2016 insurance policies, but an insurer declined coverage under that policy year on the ground that the 2016 lawsuit arose out of circumstances disclosed in the 2015 notice of circumstance. *Alexion*, 339 A.3d at 698–700.

The Delaware Supreme Court concluded that the securities lawsuit was "meaningfully linked to the wrongful acts disclosed in the 2015 Notice." *Id.* The court first explained that because the 2015 notice of circumstance was not a claim, the inquiry should not be "narrowed" to whether the wrongful acts alleged in the SEC's subpoena were linked to securities lawsuit. *Id.* at 703. Instead, the proper analysis is "whether the [securities lawsuit] is meaningfully linked to any of the wrongful acts disclosed in the 2015 Notice." *Id.* at 704. Conducting that analysis, the Court concluded that both "involve[d] the same alleged wrongdoing—Alexion's grantmaking activities worldwide." *Id.* In reaching that conclusion, the court relied on the fact that the securities lawsuit explicitly referred to the SEC subpoena and investigation into Alexion and also cited a *Bloomberg* article reporting on that same investigation. *Id.* Because the SEC investigation and the securities lawsuit involved the same underlying conduct, it did "not matter whether the SEC and the stockholder plaintiffs are different parties, asserted different theories of liabilities, or sought different relief." *Id.* Although the relevant time periods were not identical, they overlapped. *Id.* at 705. And the court found the differences in legal theories overstated, as the SEC also investigated whether Alexion's financial disclosures were accurate, and the securities lawsuit alleged that they were not. *Id.*

Applying *Alexion* here, the Court concludes that there is a meaningful link between the 2015 Notice of Circumstance and the 2017 Securities and Derivative Lawsuits. Most importantly, they involve the same alleged conduct—specific accounting improprieties and material misrepresentations in financial statements regarding those specific improprieties.

The Alistair Letter alleged that numerous specific accounting deficiencies caused AmTrust's financial statements to be materially inaccurate and suggestive of material weaknesses in internal controls over financial reporting. The Alistair Letter identified several specific areas

where AmTrust's accounting appeared deficient, including (among others), loss and LAE reserves, accrued liabilities, deferred acquisition costs, valuation of life settlement contracts, and accounting for intercompany transactions. The Alistair Letter alleged that because of these deficiencies, AmTrust's financial statements were materially misstated in particular ways. The 2017 Securities and Derivative Lawsuits are based on those same accounting deficiencies and allege that AmTrust's financial statements were false and misleading for many of the same reasons discussed in the Alistair Letter. The 2017 Securities and Derivative Lawsuits repeatedly cite to and use the Alistair Letter and its allegations as supporting evidence. Under *Alexion*, the 2015 Notice of Circumstance and the 2017 Securities and Derivative Lawsuit arise from the same underlying circumstances and are meaningfully linked.

And the Alistair Letter did not merely allege weaknesses in AmTrust's internal controls over financial reporting generally but instead identified specific material weaknesses regarding specific controls over specific accounts. It identified (i) discrepancies between AmTrust's 8-K forms and its 10-K and 10-Q forms, (ii) deficiencies in AmTrust's loss reserve triangles for years 2008 and 2009, (iii) discrepancies in AmTrust's disclosures regarding accrued expenses and other liabilities, and (iv) issues with AmTrust's accounting for subsidiaries and intercompany transactions. The 2017 Securities and Derivative Lawsuits alleged the same specific material weaknesses in AmTrust's internal controls over financial reporting for the same specific reasons. Perhaps if the Alistair Letter and the 2017 Securities and Derivative Lawsuits both merely alleged generally that AmTrust had material weaknesses in AmTrust's internal controls over financial

24

reporting, those generalities would be insufficient. But here, both the Letter and the Lawsuits rely

on the same specific weaknesses in internal controls.[8]

_____

[8] Amtrust says that, even though the 2015 Notice and the Securities and Derivative lawsuits mention the same types of accounting deficiencies, there is nevertheless no meaningful link between them. The Court briefly addresses each of its arguments.

Deferred Acquisition Costs. AmTrust contends that although both the Alistair Letter and the Securities and Derivative Lawsuits discuss DACs, the Alistair Letter alleges that AmTrust did "not recognize enough DAC expense," but in the Restatement, "AmTrust corrected an over-recognition of deferred acquisition cost expense," which AmTrust asserts is the opposite issue. (D.I. 161 (AmTrust's Answering Br.) at 18.) But as explained, comparing the Restatement to the Alistair Letter is not the proper comparison. Instead, the Court must compare the conduct alleged in the Alistair Letter to the conduct alleged in the Securities and Derivative Lawsuits, and both the Alistair Letter and the Securities and Derivative Lawsuits alleged that AmTrust improperly over-expensed its DACs thereby overstating its net income. (D.I. 133, Ex. 32 at 7–9; Ex. 7 ¶¶ 141–42, 157; Ex. 11 ¶¶ 74, 88, 225–27.)

Consolidation of Luxembourg Reinsurance Captives ("LRCs"). AmTrust next contends that the Securities and Derivative Lawsuits' discussion of LRCs is at too high a level of abstraction to be deemed to involve the same conduct as the Alistair Letter's more specific allegations that AmTrust was excluding losses ceded to the LRCs. (D.I. 161 at 18.) Not so. The Alistair Letter alleged that AmTrust hadn't "provided a viable explanation that reconciles the Net Loss and Loss Adjustment Expenses of its subsidiaries with the Net Loss and Loss Adjustment Expenses" AmTrust reports in its SEC filings. (D.I. 133, Ex. 32 at 13.) In other words, the Letter alleged that AmTrust was not properly consolidating its subsidiaries' financial statements, specifically with respect to Net Loss and Loss Adjustment Expenses. The Alistair Letter posited that the "difference appears to be related to Loss and Loss Adjustment Expenses assumed by the LRCs, which seem to be *excluded* from AmTrust's reported results in SEC filings, even though the SEC filings seem to *include* the benefit AmTrust International Insurance, Ltd. ('AII') receives." (*Id.*) The Securities and Derivative Lawsuits parrot this allegation—that AmTrust was not properly accounting for intercompany transactions by excluding losses ceded to LRCs. (D.I. 133, Ex. 7 ¶¶ 306, 308–10, 319, 400; Ex. 11 ¶¶ 58, 62–64, 81.)

Accrued Expenses. AmTrust also asserts that the Securities and Derivative Lawsuits' discussions of accrued expenses are vague and identify different accrued expenses than the Alistair Letter. (D.I. 161 at 18–19.) In questioning whether AmTrust maintains effective internal controls over financial reporting, the Alistair Letter pointed out that AmTrust's financial statements were irreconcilable with each other and used Accrued Expenses & Other Liabilities as one example of an account that could not be reconciled. (D.I. 133, Ex. 32 at 5–6.) Both the Securities and Derivative Lawsuits, citing the Alistair Letter, alleged that AmTrust failed to maintain effective internal controls over financial reporting specifically with respect to accrued expenses. (D.I. 133, Ex. 7 ¶¶ 332–35, 503; Ex. 11 ¶¶ 73, 86–88, 125, 211, 222–23, 231, 234, 237, 244–45.)

Loss and Loss Acquisition Expense ("LAE") Reserves Assumed in Acquisitions. Finally, AmTrust contends that the Alistair Letter's allegations regarding loss and LAE reserves are "not comparable" to the Securities and Derivative Lawsuits' discussions of the issue. (D.I. 161 at 19.)

The Securities and Derivative Lawsuits also alleged that AmTrust made material misrepresentations in its financial statements, specifically with respect to AmTrust's warranty revenue, accrued compensation expense, deferred acquisition costs, and intercompany transactions. These same alleged misrepresentations are discussed in the Alistair Letter.

And both the Letter and the Lawsuits rely on the same evidence. Both rely on AmTrust's financial statements and its officers' public statements regarding AmTrust's accounting. Both rely on the same accounts. And of course, both the Securities and Derivative Lawsuits specifically cite to and reference the Alistair Letter itself.

The remaining applicable factors also suggest a meaningful link (to the extent they are even relevant to the analysis).[9] The relevant time periods overlap. The theories of liability are similar— both allege that AmTrust committed specific violations of accounting rules causing its financial statements to be materially misleading and/or false. And as discussed, the Securities Lawsuits rely on much of the same evidence discussed in the Alistair Letter.[10]

---

The Alistair Letter alleges that the amounts disclosed in AmTrust's financial statements for loss and LAE reserves are irreconcilable and demonstrate a $100 million hole. (D.I. 133, Ex. 32 at 4–5, 14–15.) The Derivative Lawsuit repeats this allegation (D.I. 133, Ex. 11 ¶¶ 72, 78, 100), and although the Securities Lawsuit does not focus on this issue, it does allege that there were inconsistencies in AmTrust's financial statements with respect to loss reverses (D.I. 133, Ex. 7 ¶ 317). Perhaps if this were the only alleged similarity between the Securities and Derivative Lawsuits and the Alistair Letter, AmTrust's position might have some force. But it is not.

[9] "It is the common underlying wrongful acts that control." *Alexion*, 339 A.3d at 704.

[10] While not dispositive here, Delaware courts have also relied on the parties' representations about the matters when insurance coverage was not at issue as probative of whether there is a meaningful link. *First Solar*, 274 A.3d at 1017. The record demonstrates that AmTrust's own executives and advisors considered that the allegations raised in the Securities and Derivative Lawsuits, the SEC Investigation, the Short Reports, and the Alistair Letter were all related. (D.I. 121, Ex. A at 2, 6 (AmTrust's General Counsel asserting that the Alistair Letter, Short Reports, and government investigations "raise[] precisely the same issues"); D.I. 133, Ex. 36 at 50 (AmTrust executive explaining that "[t]here was this thematic similarity, similar themes arose both

AmTrust's remaining arguments are unpersuasive.  AmTrust argues that the conduct is different because the Securities and Derivative Lawsuits rely on the Restatement, and the Restatement identified two primary issues—recognition of warranty revenue and accounting for discretionary bonuses—absent from the Alistair Letter.  But the Restatement identified numerous issues, and those issues overlap with the Alistair Letter.  (D.I. 133, Ex. 6 at F-23, F-24.)  In any event, the question is not whether the Alistair Letter and the Restatement are meaningfully linked, but whether the 2015 Notice of Circumstance and the Securities and Derivative Lawsuits are meaningfully linked.  *Alexion*, 339 A.3d at 703–04.  The Securities and Derivative Lawsuits allege the same underlying conduct as the Alistair Letter.  And merely because the Securities and Derivative Lawsuits also allege additional improprieties absent from the Alistair Letter does not break those meaningful links.  *Id.* at 704–05.  Delaware law is clear that the Court should focus on the similarities between matters, not their differences.  *Id.*; *First Solar*, 274 A.3d at 1015.

AmTrust also contends that Liberty relies on an indirect chain of events that is too attenuated to satisfy the meaningful linkage standard.  (D.I. 161 (AmTrust's Answering Br.) at 8.)  But the Court's holding here is based primarily on the fact that the Securities and Derivative Lawsuits and the 2015 Notice of Circumstance involve the same underlying conduct.  That the Alistair Letter also set into action a chain of events that directly led to the 2016 Restatement, which then prompted the Securities and Derivative Lawsuits, does not detract from but supports the conclusion that the circumstances are meaningfully linked.  *See Eon Labs Mfg., Inc. v. Reliance*

---

in the allegations of the securities class action and what the SEC was actually looking at," that "there were similar issues in reserving, in accounting[,] that "[t]hey were also looking into issues of scienter and what the company knew and how[,]" and that "[t]here were overlapping individuals in both those matters"); D.I. 27, Ex. D at 125 (AmTrust Proxy Statement asserting that "[s]ince June 2013, the Company has been responding to an investigation by the SEC" regarding the same issues raised by the Alistair Letter, the Restatement, and the Short Reports).)

*Ins. Co.*, 756 A.2d 889, 893–94 (Del. 2000) (holding that costs were excluded under an "arising out of" exclusion where the conduct underlying the first claim was a "but for" cause of the second claim); *Goggin v. Nat'l Union Fire Ins. Co. of Pittsburgh*, No. N17C-10-083, 2018 WL 6266195, at *5 (Del. Super. Ct. Nov. 30, 2018) (same).

AmTrust further contends that the other factors, such as the identity of the parties and the relevant timeline, are not identical. True enough, but "absolute identity is not required." *First Solar*, 274 A.3d at 1016. As the Court has explained, there is sufficient overlap in these other factors to suggest a meaningful link. And even if there were not, the Delaware Supreme Court has made clear that "it does not matter whether" these additional factors weigh against a finding of meaningful linkage where the underlying conduct is the same. *Alexion*, 339 A.3d at 704.

AmTrust argues that the legal theories are different. But as the Delaware Supreme Court explained in *Alexion*, the Court cannot treat the 2015 Notice as if it were a claim and must instead examine the underlying conduct alleged. *Id.* at 703–04.

The Court has considered AmTrust's remaining arguments and finds them unpersuasive. For these reasons, the Court finds that the Securities and Derivative Lawsuits are meaningfully linked to, and therefore arise out of, the 2015 Notice of Circumstance. Accordingly, AmTrust's costs incurred with respect to the Securities and Derivative Lawsuits are excluded under the 2016–2017 policy period. Those costs are properly slotted under the 2014–2015 policy period.

## IV.    CONCLUSION

For the reasons explained above, the Court concludes that AmTrust's costs incurred with respect to the Securities and Derivative Lawsuits are excluded from coverage under the 2016–2017 Tower. An appropriate order will follow.